UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE DETROIT
CARPENTERS FRINGE BENEFIT
FUNDS,                                                          Case No. 11-cv-14656

                        Plaintiffs,                             Paul D. Borman
                                                                United States District Judge

v.

ANDRUS ACOUSTICAL, INC.,
a Michigan Corporation, STERLING
MILLWORK, INC., a Michigan
Corporation, ALAN ANDRUS, an
individual, and MARK BOLITHO,
an individual, jointly and severally,

                        Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 44, 46) AND DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 48)

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment (ECF No. 48) and Defendants' Motions for Summary Judgment (ECF Nos. 44, 46.) The parties have filed responses and replies. The Court held a hearing on February 11, 2014. For the reasons that follow, the Court concludes that genuine issues of fact remain as to whether the Defendants were engaged in a double breasted operation and therefore DENIES Defendants' Motions and DENIES Plaintiffs' Motion.

1

**INTRODUCTION**

In this labor employment benefits litigation,[1] Plaintiffs, Trustees of the Detroit Carpenters Fringe Benefit Funds (Plaintiffs or "the Funds"), claim that the Defendants Andrus Acoustical, Inc. ("Andrus") and Sterling Millwork, Inc. ("Sterling") are operating as alter egos to avoid the fringe benefit obligations of Andrus's Collective Bargaining Agreement ("CBA") with the Michigan Regional Council of Carpenters (the "Union"). Plaintiffs claim that the alter ego entity of Andrus/Sterling has failed to make proper fringe benefit contributions to the Plaintiffs and seek an audit, accounting and liquidated damages pursuant to the CBA and ERISA. Defendants respond that Sterling is a separate business entity, in a different business than Andrus, and denies that the two companies are alter egos. Plaintiffs and Defendants have both moved for summary judgment.

**I.   BACKGROUND**

Plaintiffs are the Trustees of fringe benefit funds that collect fringe benefits for union carpenters who are members of local carpenters unions that make up the Michigan Regional Council of Carpenters. Any employer that is a party to a collective bargaining agreement with the local unions is required to withhold these benefits from paychecks of union member carpenters and is required to pay those withholdings into the Funds.

Andrus is a commercial contractor, owned by Defendant Alan Andrus. Alan Andrus is the sole owner of Andrus and has owned the company since 1977 when it was established. (ECF No. 44, Sterling Mot. Ex. 7, October 29, 2012 Deposition of Alan Andrus 6-7.) Andrus is a party to a

---

[1]  Plaintiffs filed this action pursuant to their standing "as a trust fund established pursuant to the Lobar-Management Relations Act of 1947 ("LMRA") as amended, 29 U.S.C. § 141 *et. seq*., and the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et. seq*. . . ." Plaintiffs Complaint Dkt. #1, 10-21-11 ¶ 1.

CBA with the carpenters' Union and has been since 1992.  (ECF No. 48, Pls.' Mot. Exs. 1-4.)

Andrus does not dispute that it is subject to the terms and conditions of the CBA, which require

Andrus to make fringe benefit contributions to the Funds for all covered carpentry work performed

by Andrus.  (CBAs § 1.2, 10.1.)

> The CBAs contain an Alter ego/Successor Entities provision that provides:

> **Alter ego/Successor Entities**.  If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners, or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management, or control, the terms and conditions of this Agreement shall be applicable to all such work and to such successor or alter ego entity.

ECF No. 48, Pls.' Mot. Partial Summ. Judg. Exs. 2, 3, 4, Sec. 5.4.

> The CBAs also contain a provision prohibiting a signatory from subcontracting work to a

contractor who is not bound by the CBA:

> **Subcontracting**.  No Employer shall subcontract or assign any of the work described herein which is to be performed at a job site to any contractor, subcontractor or other person or party who fails to be bound by this or other applicable Union agreements . . . . The Employer agrees that it will be a surety for nonpayment of delinquent wages and fringe contributions due and payable on all covered work which has been subcontracted and will promptly pay any such amounts not otherwise timely paid by the Employer's subcontractor(s).  Signatory Employer further agrees to promptly pay the difference of all wages and fringes to Employees in the event a subcontractor is used that fails to pay the proper wage and fringe benefit rate.

*Id*. Sec. 5.1.

> According to Alan Andrus, ceiling tile work comprises 90-95% of Andrus's business.

(Andrus Dep. 7.)  Andrus began doing "some carpentry" work with Sterling in 2008 when Mark

Bolitho, of Sterling, hired Andrus to perform carpentry work on certain "union labor only" jobs.

*Id*.  The greatest number of employees that Andrus has had at any given time is 15, and this was

3

back in 1996-97. *Id*. at 8. Alan Andrus testified that he decides what bills get paid, when they are paid, who is hired, and who is fired. *Id*. at 8-9. Andrus testified that rates of pay are decided by the Union. *Id*. at 9. Andrus testified that the first job he did for Sterling was on a school in Waterford, Michigan performing only acoustical ceiling work for that job. *Id*. at 11.

Alan Andrus is the sole owner of Andrus. Sterling has no ownership interest in Andrus and Andrus has never had any ownership interest in Sterling, nor has any member of his family. Andrus Dep. 20; ECF No. 44, Sterling Millwork Mot. Summ. Judg. Ex. 1, Andrus Acoustical Articles of Incorporation; Exs. 9, 10, Sterling Millwork Corporate Filings; Pls.' Mot. Ex. 6, Oct. 16, 2012 Deposition of Mark Bolitho 16. Andrus operates out of a condominium owned by Alan Andrus in Roseville, Michigan - there is no shop location for Andrus. Alan Andrus Dep. 20. Alan Andrus also owns a home in Arizona which he also uses as an office. *Id*. Andrus does not share any space with Sterling, does not rent space from Sterling, has never loaned money to Sterling or borrowed money from Sterling, or to or from Mark Bolitho personally. *Id*. 21-22. Andrus and Sterling have never done any joint marketing. *Id*. at 23. Alan Andrus has known Mark Bolitho since about 2006. *Id*.

Sterling is not a party to a CBA and is owned by Mark Bolitho and his wife. Pls.' Mot. Ex. 6, Bolitho Dep. 6. Sterling does general contracting and carpentry-related subcontracting; drywall, metal studs, insulation, acoustical ceiling, millwork, doors, trim, hardware and supplies and installs all materials for this work. *Id*. Mark Bolitho decides what jobs to bid, how to staff jobs, who to hire, who to fire, what to pay employees, when to pay bills and sets employment policies. *Id*. at 6-7. Bolitho testified that he became aware of Andrus when looking for someone to sub out acoustic ceiling work. *Id*. at 15-16. Bolitho described Andrus as a subcontractor of Sterling's to whom Sterling subcontracted carpentry work. *Id*. at 20. There is no familial relationship between Bolitho

4

and Alan Andrus and the two entities do not share space, loan each other money or do any joint marketing. *Id*. at 17-19.

When Sterling needs carpentry help on jobs, it sometimes subcontracts out to Andrus. Sterling estimators prepare bids for those jobs. *Id*. at 20-21. If a job on which Sterling has bid calls for Union labor only, Sterling would sub those jobs out to union CBA companies. *Id*. at 22. Bolitho testified that on jobs subbed out to Andrus, he told several Sterling employees to sign up with the Union because Andrus did not have enough carpenters on staff to handle the work. *Id*. For example, Bolitho testified that if Sterling employees had worked the Detroit Metropolitan Airport job, they would not have been paid union wages and benefits. *Id.* 22-23. Bolitho testified that whenever he subcontracts out work, his employees supervise the job and Sterling provides materials and tools necessary to do the job. *Id*. at 24-25.

Andrus testified that the first job on which he performed carpentry work for Sterling was either the Detroit Metropolitan Airport job or the Laurel Park Mall job in 2008. *Id*. Andrus also did work for Sterling on the Plum Market job. *Id*. at 13. Andrus testified that Mark Bolitho called him and said that he had some carpentry work that needed to be done by union carpenters and asked if Andrus would do the jobs but hire Sterling's employees to do the work. *Id*. at 12. Andrus testified that he agreed to the arrangement, hired Sterling's carpenters to do the work, sent them down to join the Union and when the job was ready, the Sterling/Andrus employees performed the work. *Id*. Andrus testified that Sterling's carpentry tools were used to perform the work and Sterling supplied the materials. *Id*. at 14. Further, when Andrus was doing carpentry work for Sterling, Sterling employees supervised the work. *Id*. at 13. Andrus had not then and has not now done carpentry work utilizing Andrus employees for anyone other than Sterling, except for a small job for a

5

company called Diversified.  *Id*. at 7, 28.  When Andrus performed carpentry work for Sterling, Sterling put together the estimates for the jobs.  Sterling put together a quote for themselves and then hired Andrus (using Sterling employees and Sterling carpentry tools) to do the work on an hourly basis.  *Id*. at 11.  Thus, Andrus provided only "union-cover" for the Sterling carpenters that it put on the Sterling jobs requiring union carpenters.

When the Andrus/Sterling employees were working the union jobs as Andrus employees, they would report their hours to Sarah Johnston, who was the payroll/human resources/office manager for Sterling.  (ECF No. 48, Pls.' Mot. Ex. 12, Oct. 15, 2012 Deposition of Sarah Johnston 6).  Johnston would learn from the foreman on a job (a Sterling employee) or from Sterling's owner Mark Bolitho which hours the Sterling employees had worked for Andrus and which they had worked for Sterling.  *Id*. at 18-19, 23, 26-27.  Significantly, in many instances, the time sheets submitted by the employee would indicate that he had worked all of his hours for Andrus, but Johnston, at the direction of Bolitho, would allocate a certain number of hours to Sterling and would create a duplicate time sheet.  Of course, the Sterling-designated hours did not require contributions to a union benefit fund, since Sterling had not entered into a CBA with the Carpenters' Union.  Johnston would then generate a report based on the time sheets she prepared detailing Andrus's share of the labor charges, and email the reports to Alan Andrus.  *Id*. at 27-28.  Johnston testified that she would then make a direct deposit into Andrus's account for these amounts.  *Id*. at 29.  Andrus was instructed to always use the hours as stated in her reports and she supplied the name, address and social security numbers necessary for Andrus to pay the employees.  *Id*. at 30, 33.  When Sterling employees were doing Andrus work, they were still covered by their Sterling health care.  *Id*. at 32.

Johnston testified that Sterling did not prepare time sheets for any Sterling subcontractor other than Andrus, and she was not aware of any other subcontractors with whom Sterling dealt who used Sterling employees. *Id*. at 36. Likewise, Alan Andrus did not use the employees of other contractors to perform carpentry work on any other jobs. The arrangement with Sterling, in which Johnston controlled the timekeeping function, was unique to the work Andrus did for Sterling. Andrus Dep. 55.

Alan Andrus testified that he would receive an email from Sarah Johnston listing the hours that the Sterling employees had worked and would issue a paycheck to those "Andrus" employees based on those hours and then send an invoice to Johnston for that amount. Andrus Dep. at 18-19. Then he would receive a deposit from Sterling directly into his checking account, an "ACH or automated clearing house transfer," for those hours worked. *Id*. Alan Andrus and Mark Bolitho had predetermined a dollar amount based on the Union rate plus a profit for Andrus - at the time the Union rate was $48.75/hour. (ECF No. 55, Pls.' Resp. Ex. I, Carpenter Journeyman Rates June 1, 2008 through May 31, 2009.) Andrus and Bolitho agreed upon a rate of $58/per carpenter per hour. They agreed that Sterling would also pay Andrus a $5 premium over that amount, say $63/hour. Andrus Dep. at 19, 49. On the occasions when Alan Andrus would receive a time sheet from an employee that indicated a greater number of hours worked for Andrus than the hours reported in Sarah Johnston's emails, Andrus testified that he followed Johnston's instructions to use the hours as she reported them in her emails, even though the supervisor or employee may have reported more hours allocable to Andrus. (*Id*. at 51-53; Pls.' Mot. Ex. 16, Email Correspondence between Alan Andrus and Sarah Johnston.). This clearly evidenced Sterling's control over Andrus with regard to the Carpenters' Union wages and benefits.

7

Alan Andrus testified that for work that Andrus performed for Sterling from January, 2008 to November, 2011, all workers who performed on union jobs were paid a union wage and benefits were contributed to the Funds. *Id*. at 29, 30-31. Sterling paid Andrus for all of the work that Andrus performed on all of the Sterling jobs. *Id*. All but two of the carpenters who worked for Andrus on the Sterling jobs came from Sterling and those two performed very little work on the Sterling jobs. *Id*. at 30. Alan Andrus had not been aware that some of the "Andrus" employees working the Sterling jobs were also doing non-union work, as testified by Matthew Forster in his Affidavit. (ECF No. 48, Pls.' Mot. Ex. 14, October 18, 2011 Affidavit of Matthew Forster.)

Forster testified that in 2008, when he was employed by Sterling, Philip Bax took him and Michael Macek to the Carpenters' Union hall to obtain union cards so that they could work on the Detroit Metropolitan Airport job. Forster was never an employee of Andrus. *Id*. ¶¶ 2-9. Forster worked 24 hours at the Detroit Metropolitan Airport job the week ending June 9, 2008 and submitted his time sheet to Sterling for the carpentry work he performed there. He received a paycheck from Andrus for 16 of the 24 hours worked that week at a rate of $30.16/hour and Andrus made fringe benefit contributions on that work to the Funds for only the 16 hours listed on the Andrus paycheck. *Id*. ¶¶ 10-13. Forster received a paycheck from Sterling for 8 of the 24 hours worked that week at the Airport job at a rate of $26/hour and no contributions were made to the Funds for those wages. *Id*. ¶¶ 14-15. Forster was told by Mark Bolitho that he was receiving a lower wage from Sterling for some of his hours for his carpentry work on the Airport job because Sterling "had to pay into the union for this job." *Id*. ¶ 16. Forster worked on the Airport job on and off until October 5, 2008, and received paychecks splitting his hours in this manner for all of the hours he worked. *Id*. ¶¶ 17-18; Pls.; Mot. Ex. 39-42, Matt Forster Time Sheets.

8

While working on the Detroit Airport job, Forster used Sterling equipment and was supervised by Phil Bax, a Sterling employee. Bax told Forster and other Sterling employees working the Airport job to tell anyone from the Union who asked that they were working for Andrus but using Sterling tools. Forster Aff. ¶¶ 20-21. Bax told Forster and the other Sterling employees to avoid any Union agents at the Detroit Metro Airport job and to tell them that they did not know what their hourly pay was going to be because they had not received their first paycheck. *Id*. ¶ 22. When Forster was not working the Detroit Metro Airport job he worked the Newburgh (Laurel Place Mall) job, along with seven other Sterling employees, and was paid and supervised in the same manner as the Airport job. *Id*. ¶¶ 23-28; Alan Andrus Dep. 37-43. Sterling equipment and tools were used at the Laurel Park job and Sterling ordered and paid for all of the materials used at both the Airport job and the Laurel Park job. Bax used a Sterling credit card to purchase gas for his vehicle, which carried the tools to and from the job sites. Forster Aff. ¶¶ 26-31. Alan Andrus testified that he had read Forster's Affidavit and discussed it with Mark Bolitho, who did not deny Forster's statements. Andrus Dep. 32. Alan Andrus testified that he didn't know this was happening but didn't really care because he was being fully reimbursed by Sterling for every dollar he paid to the Andrus/Sterling employees. *Id*. at 32-33. While the "Andrus" employees were working for Sterling they were covered by Andrus's Worker Compensation policy. *Id*. at 33. Andrus never reimbursed Sterling for any expenses, materials or tools used on the jobs performed for Sterling. *Id*. at 35. Alan Andrus testified that he was not aware on any given day whether his employees who he was paying to work the Sterling jobs were doing work for Sterling or Andrus or both. His only information about what work they performed came from Sarah Johnston's emails, which would indicate the hours worked and the rate to be paid. *Id*. at 36-37.

9

Adam Graves works as a project manager for EMJ Corporation and was the construction manger on the Laurel Park job. (Pls.' Mot. Ex. 21, Jan. 24, 2013 Deposition of Adam Graves 7.) Graves testified that Sterling contracted to do the work for the framing and metal stud frames, drywall, acoustical ceiling work, rough and finish carpentry work for the Laurel Park job. *Id*. at 8-9. The subcontract between EMJ and Sterling prohibited Sterling from subcontracting work without EMJ's consent and required that all work on the project would be completed by union labor. *Id*. at 9, 13; Pls.' Mot. Ex. 22, Subcontract Agreement between EMJ and Sterling 1, 3, 10. Graves was unaware of any request by Sterling to subcontract work on the Laurel Place job and in fact had never heard of Andrus and was not aware that Andrus had performed any work on the Laurel Place job. Graves Dep. at 9, 21. In fact, however, as Sterling's time sheets reveal, hours were being submitted on the Laurel Park project under the name of Andrus, some splitting time between union and non-union hours worked. (Pls.' Mot. Exs. 26, 27, 31, 33, 35; Forster Aff.)

This practice of creating duplicate time sheets was employed on all of the Andrus/Sterling jobs. When questioned at their depositions, the workers did not recognize the handwriting on the "duplicate" time sheets that broke down their hours to union and nonunion time. Sterling's payroll records substantiate that in fact they were paid per the duplicate "split" time sheets . (Pls.' Mot. Exs. 26-28 as to James Walker on the Laurel Park job; Exs. 31, 33, 34 as to Dwayne Hill on the Laurel Park job; Exs. 39-41 as to Matt Forster on the Airport job; Exs. 43-45 as to Robert Campbell on the Plum Market Job.) In each instance, the original time sheet completed by the worker indicated a greater number of union hours than appeared on the duplicate time sheet that was submitted to Andrus and used by Andrus to make the payments to the Andrus/Sterling employees. The balance of the hours not paid by Andrus were paid by Sterling at the lower nonunion wage rate and without

10

contributions to the Funds. All Extra Work Proposals by Sterling to EMJ on the Laurel Park job also specified that Sterling would "furnish all union labor." (Pls.' Mot. Ex. 23-25, 30, 38 Extra Work Proposals.) The same was true for Sterling employees working the Plum Market job. Pls.' Mot. Exs. 43-52.

Robert Reeves performed an audit for the Funds based upon Sterling's payroll records for certain jobs. (ECF No. 55, Pls.' Resp. Ex. L, May 13, 2013 Affidavit of Robert Reeves.) Reeves calculated what the fringe benefit liability to the Funds on the Laurel Park job would have been based upon the Sterling payroll report and concluded that the liability was $35,722.99 for covered carpentry work performed on the Laurel Park job from May 1, 2008 to October 31, 2008. *Id.* ¶¶ 12-13. Reeves determined that neither Sterling nor Andrus submitted any fringe benefit contributions to the Funds for the work performed at Laurel Park. *Id.* ¶¶ 15-16. Reeves conducted a further audit of 28 projects based on Sterling's payroll reports that revealed a fringe benefit liability in excess of $250,000 in unpaid contributions for covered carpentry work. *Id.* ¶ 20.

Bolitho acknowledged that the Laurel Park subcontract with EMJ required that all work be performed with union labor. *Id.* at 25. Bolitho concedes that both Andrus and Sterling provided labor on the Laurel Park job for carpentry work. *Id.* at 26. Bolitho admitted that Sterling paid no fringe benefits on the Laurel Park work because Sterling "can't" pay money into the Funds because they are not a Union shop. *Id.* Bolitho couldn't remember how he decided what portion of the Laurel Park job would be done by union and what part by non-union - he states that it was discussed with the "owner" who didn't care if certain jobs were union. *Id.* at 27.

When Bolitho was shown the Sterling employee's time sheets from the Laurel Park job he conceded that he could not determine why certain portions of the work were designated as having

11

been performed for Andrus and others for Sterling.  *Id*. at 27-29.  Bolitho acknowledged that if a subcontract required all work to be performed by union labor, he could not have Sterling employees perform the work.  *Id*. at 30-32.  Bolitho recalled that another Sterling company he owned had been accused of running an alter ego operation to avoid paying fringe benefits but Bolitho recalled that the Union had lost.  *Id*. at 37-38.  In fact, the Union won and the Court found that Sterling was engaged in an alter ego operation.  *Id*. at 38; ECF No. 55, Pls.' Resp. Ex. A, *Trustees of the Carpenters' Funds v. Mark Bolitho, et al.*, No. 93-74427, Findings of Fact and Conclusions of Law, Judgment in Favor of Plaintiffs (E.D. Mich. Oct. 30, 1998).

David Milka, James Walker, Robert Campbell, all Sterling employees, testified consistently that when they worked an Andrus job they knew that the job was union labor only, they used Sterling equipment and tools, they turned their time sheets in to Sarah Johnston, received paychecks from Andrus and were paid a higher wage and fringe benefits for the hours worked on an Andrus jobsite, like Laurel Place, the Airport or Plum Market.  (Pls.' Mot. Ex. 7, Oct. 11, 2012 Deposition of David W. Milka 13-18; Ex. 8, Oct. 11, 2012 Deposition of James Walker 7-12; Ex. 9, Oct. 11, 2012 Deposition of Dwayne Hill 14-20; Ex. 10, Oct. 15, 2012 Deposition of Robert Campbell 8-14.) It was their understanding that when working on a job that was for Andrus, they were working for and being paid by Andrus, not Sterling, with limited exceptions for hours spent "managing" the job. Philip Bax testified that Mark Bolitho asked him to work for Andrus on the Laurel Park job because the subcontract required union labor.  Pls.' Mot. Ex. 11, Oct. 11, 2012 Deposition of Philip Bax 15. Bax stated that when working for Andrus, he used Sterling equipment, Sterling tools and turned his time sheets in to Sarah Johnston.  *Id*. at 17.  Bax testified that if he spent part of his day on an Andrus job site and part of the day elsewhere, he would be paid by both Andrus and Sterling for that

day.  *Id*. at 21-22.  In some instances, another set of time sheets was prepared that split his hours differently than Bax had reported them.  *Id*. at 22-23.  Sarah Johnston testified that she would prepare a second time sheet if Mark Bolitho or a Sterling foreman had reported that the employee had worked for both Sterling and Andrus on a given day, in which case Sarah would separate out the hours before submitting the time sheets to Andrus.  Pls.' Mot. Ex. 12, Johnston Dep. 18-19, 22-23, 28.  Bax never complained about not getting the higher union wage rate for hours he had reported as having been worked for Andrus.  Bax Dep. 23.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may file a motion for summary judgment "at any time until 30 days after the close of all discovery," unless a different time is set by local rule or court order.  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  *See also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)

13

(quoting Black's Law Dictionary 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial.  *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).  "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The rule requires the  non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact.  *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).  "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party."  *Pucci v. Nineteenth*

14

*Dist. Ct.*, 628 F.3d 752, 759 (6th Cir. 2010).

"Rule 56(e)(2) leaves no doubt about the obligation of a summary judgment opponent to make [his] case with a showing of facts that can be established by evidence that will be admissible at trial.... In fact, '[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.' Rule 56(e) identifies affidavits, depositions, and answers to interrogatories as appropriate items that may be used to support or oppose summary judgment." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)).

"In reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, the facts and any inferences that can be drawn from those facts[ ] must be viewed in the light most favorable to the non-moving party." *Id.* (alteration in original) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) and *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005)). "'For cross-motions for summary judgment, we must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the non-moving party.'" *Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir. 2005) (quoting *Beck v. City of Cleveland*, 390 F.3d 912, 917 (6th Cir. 2004)).

## III. ANALYSIS

"While only parties to collective bargaining agreements are bound generally, in some instances a non-signatory to the agreement may be so closely related to a signatory that both are

bound." *Distillery, Wine & Allied Workers Int'l Union, Local Union No. 32 v. Nat'l Distillers & Chem. Corp.*, 894 F.2d 850, 851 (6th Cir. 1990) (applying the "single employer" test created by the NLRB which considers "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership"); *Trustees of Detroit Carpenters Fringe Benefit Funds v. Industrial Contracting, LLC*, 581 F.3d 313, 317–18 (6th Cir. 2009) (applying the "alter ego" test which asks "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership").   While both the "single employer" and the "alter ego" theories analyze similar factors, the former focuses on a situation where "two entities concurrently perform the same function and one entity recognizes the union and the other does not," while "'[t]he focus of the alter ego doctrine . . . is on the existence of a disguised continuance *or* an attempt to avoid the obligations of a collective bargaining agreement through a sham transaction or a technical change in operations.'" *Barbera v. R. Rio Trucking*, No. 03-cv-1508, 06-cv-1329, 2010 WL 3928553, at *9 (E.D.N.Y. Sept. 30, 2010) (quoting *Brown v. Sandimo Materials*, 250 F.3d 120, 129 n. 3 (2d Cir. 2001) (alterations in original) (emphasis added). *See also Laborers' Pension Trust Fund - Detroit & Vicinity v. Standard Machine & Equip. Co.*, 862 F.2d 316, 1988 WL 120892, at *3 (6th Cir. Nov. 14, 1988) (table case) (observing that "single employer" and "alter ego" theories are conceptually distinct, the former concerned with representational bargaining unit issues and the latter concerned with contractual issues raised in applying the collective bargaining restrictions of a signatory employer to a non signatory employer).

In this case, Plaintiffs claim that Sterling and Andrus were alter egos engaged in a double-breasted operation that resulted in a failure to pay fringe benefits for carpentry work covered by the Andrus CBA.  In *Industrial Contracting*, the Sixth Circuit further explained the alter ego doctrine

16

and the applicable standard:

> The alter ego doctrine is an equitable doctrine "developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing or altering their corporate form." *NLRB v. Allcoast Transfer, [Inc.]*, 780 F.2d [576,] 579 [6th Cir. 1986)]. The doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer. *See id.* at 582–83. We have addressed alter-ego operations that occur in two factual contexts. The first is when the new entity begins operations but is "'merely a disguised continuance of the old employer.'" *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir. 1990) (quoting *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942)). The second is what is referred to as a "double-breasted operation," where "two or more coexisting employers performing the same work are in fact one business, separated only in form." *Fullerton Transfer*, 910 F.2d at 336.

> The Sixth Circuit test for determining whether two companies are alter egos has been adopted from the case law of the National Labor Relations Board. We look to see "'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.'" *Id.* (quoting *Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)). In applying these factors, no individual factor is outcome determinative; instead, "all the relevant factors must be considered together." *Allcoast Transfer*, 780 F.2d at 582. Under Sixth Circuit precedents, moreover, an employer's intent to evade the obligations of a collective bargaining contract is merely one of the factors to be considered and is not a prerequisite to the imposition of alter-ego status. *Fullerton Transfer*, 910 F.2d at 337.

581 F.3d at 317–18. "In applying [the alter ego] factors, no individual factor is outcome determinative; instead 'all the relevant factors must be considered together.'" *Id.* at 318 (quoting *Allcoast*, 780 F.2d at 582) (alteration added).

### A.    Plaintiffs' Arguments

Plaintiffs claim that in order to avoid the obligations to the Funds that go along with performing work on jobs that require union-only labor, Sterling used Andrus as its alter ego, disguised as a subcontractor, and failed to pay fringe benefits on all of the work that was covered carpentry work under the Andrus CBA. Plaintiffs argue that when Mark Bolitho contacted Alan

17

Andrus to ask if Andrus would perform some union work for Sterling, he was aware that Andrus did not have enough carpenters to do the work and planned to hire Sterling's employees to work on the union-only jobs. Sterling retained total control over the payroll for the hours worked on those jobs, creating the opportunity for Sterling to manipulate the time sheets to pay some of the hours worked on those jobs at Sterling rates by only submitting a portion of the hours worked to Andrus to pay at Union rates. Plaintiffs claim that Sterling knew that auditors would review the Andrus books and records, which would show that proper wages and fringes had been paid for all work billed to Andrus, but would never see the Sterling books and therefore would never discover that not all of the covered carpentry work had been properly reported. Plaintiffs assert that Sterling used Andrus as a payroll service and only reported a fraction of the hours actually worked on the union labor jobs. Plaintiffs argue that Sterling's claim that it hired Andrus as a subcontractor to do only acoustical tile installation is belied by the record. In fact, less than 25% of the work Sterling paid Andrus for was acoustical tile installation - the bulk of the work was carpentry and nearly all of it was performed by the Sterling employees that Andrus "hired" to the work. ECF No. 55, Pls.' Resp. Ex. D, Andrus Acoustical Sales by Customer 2008-2011. In any event, under the Andrus CBAs both carpentry and ceiling work were covered work. CBAs Sec. 1.2, 10.1. Plaintiffs reject the argument that Sterling and Andrus were in a contractor/subcontractor relationship as there is no evidence of written subcontract agreement, there is no evidence that Andrus ever submitted bids for the work, Andrus used Sterling employees not its own employees, Sterling tracked the hours of the "Andrus" employees (who were actually Sterling employees), Andrus paid whatever Sterling told it to pay and Sterling provided the supervision, equipment and tools for all of the jobs.

An example of how the Sterling/Andrus arrangement was able to evade the obligations under

the CBA is illustrated by the time sheets for Jim Walker for the week ending June 15, 2008.  Walker submitted a time sheet indicating that he worked 42 hours that week for Andrus, 40 regular and 2 overtime, all "UNION."  (Pls.' Resp. Ex. E.)  A second time sheet was prepared for that week by Sterling that indicated 18 of the hours were worked for Sterling and were paid at a lower than union wage and without fringe benefits.  (*Id*. Ex. F.)  Andrus's own accounting records indicate that Walker was paid for only 24 hours of Union work that week.  (*Id*. Ex. G.)  The Affidavit of Robert Reeves, the Fund Auditor, confirms that this system resulted in the failure to pay wages and benefits in the amount of $250,000 on all of the jobs that the Sterling/Andrus operation performed together. ECF No. 55, Pls.' Resp. Ex. L Reeves Aff. ¶ 20.

### B.    Defendants' Response[2]

Sterling maintains that Sterling and Andrus are entirely separate companies, in entirely different businesses, but states that the "Plaintiffs accepted the union membership of a few Sterling Millwork carpenters so that those carpenters could perform work as Andrus employees for work subcontracted to Sterling," and that "Plaintiffs have signed "one time" or job site specific agreements with Sterling Millwork for union work."  (ECF No. 44, Sterling Mot. Summ. Judg. Ex. 10, Sterling Millwork's Answers to Interrogatories, No. 16 (a).)  No subcontract documents executed by Andrus and Sterling were submitted to the Court.

Sterling states that the two companies have entirely different business purposes.  Andrus is a small subcontractor whose primary business is the installation of acoustic ceiling tiles which accounts for more than 80% of its business.  Andrus performs a limited amount of carpentry work,

---

[2] Andrus and Alan Andrus joined in Sterling's motion for summary judgment. ECF No. 46. Andrus and Sterling did file separate responses to the Plaintiffs' motion.  (ECF Nos. 54, 56.)  Neither Sterling nor Andrus filed a reply in support of their summary judgment motions.

less than 20% of its overall business.  Andrus has revenues of about $500,000/year.  Sterling on the other hand is a large general contractor with revenues of about $10 million/year.  Sterling performs many different jobs including general carpentry, millwork, drywall, metal studs, insulation, acoustical ceilings, doors, trim, hardware and supply and installation of all of these items.  Sterling and Andrus submit that the two companies do not share the same business purpose.  It is undisputed that they do not share common ownership.

Sterling states that on "a handful of jobs" a few Sterling carpenters also became Andrus carpenters so that Andrus could adequately man the jobs.  Andrus did not employ these carpenters on any of the remaining 80% of its projects.  Andrus was hired only to perform labor for Sterling so Sterling provided the equipment for the handful of jobs.  Andrus performed the remaining 80% of its work without Sterling tools or equipment.  Defendants argue that Andrus is the sole owner and manager of Andrus and Bolitho is the sole manager of Sterling.  There is no overlap generally of management and supervision although on 100% of the 28 plus jobs at issue in this case, there is complete interrelation of management and supervision.  Alan Andrus had no involvement in those jobs and paid to "his" borrowed Sterling employees exactly what Sarah Johnston, a Sterling employee, told him to pay.

Defendants argue that Plaintiffs are attempting to "hang their hats on a single scenario - the few projects where Andrus hired employees to perform carpentry work who otherwise worked for Sterling."  Defendants argue that nothing in the CBA prohibited Andrus from performing union work for a nonunion company if all employees doing the work are union members and are paid union wages for all covered work they perform and fringe benefits are paid on that work.

C.        **Alter Ego/Double Breasted Analysis**

Plaintiffs seek to impose liability based upon an alter-ego/double breasted operation theory. In a classic double breasting operation, a company bound by a CBA creates a second, nonunion shop to do what would otherwise be union work.   *Id.*   In a "reverse double-breasting" situation, a nonunion company runs through a sister company that is bound by a CBA.   *Id.*   In either case, the essence of the double breasted inquiry is whether the business practice being challenged causes union workers to "face the threat of losing traditional work to a nonunion doublebreast."   *Becker Elec. Co. v. International Brotherhood of Electrical Workers, Local Union No. 212 AFL-CIO,* 927 F.2d 895, 899 (6th Cir. 1991).[3]

Turning to an analysis of the *Fullerton Transfer* factors, there is no evidence of common ownership in this case but a finding of alter ego status is not dependent on such a finding.   *Industrial Contracting*, 581 F.3d at 318.   Andrus and Sterling share no office space, have no financial dependencies, have no common officers or directors, have separate bank accounts and file separate tax returns.

As to business purpose, Sterling is a large general contractor performing carpentry, drywall, metal studs, insulation, acoustic ceiling, millwork, doors, trim, hardware and supply and installation of all of these items.   Sterling has gross revenues of approximately $10 million per year.   Andrus is much smaller, 90% of its business is acoustic ceiling installation and it has gross revenues of

---

[3] Defendants rely on *Road Sprinkler Fitters Local Union No. 669 v. Dorn Sprinkler Co.*, 669 F.3d 790 (6th Cir. 2012).   *Dorn* involved a claim that a new nonunion entity was merely a disguised continuance of an old union company, not the type of claim involved in this case.   In *Dorn*, the son began a business similar to his father's failed company, servicing some of the same customers but otherwise satisfying few of the *Fullerton* factors.   There were no factual allegations similar to those made here regarding the double breasted nature of the Andrus/Sterling operation.   The analysis in *Dorn* offers little guidance here.

approximately $500,000 per year.  Viewed from this perspective, the two entities do not appear to have a substantially identical business purpose.  However, on the 28 plus jobs at issue here, their business purpose was completely co-extensive, creating an overlapping identity of purpose. Although carpentry work was only 20% of Andrus's business (and importantly Andrus only performed carpentry work for Sterling), both Sterling and Andrus performed the same work (with Sterling-borrowed employees) on the 28 plus jobs on which they allegedly ran a double breasted operation.  *See Dobson Indus., Inc. v. Iron Workers Local Union No. 25*, 237 F. App'x 39, 46-47 (6th Cir. 2007) (finding a double breasted operation where the two entities had only six common customers, only two discreet areas of overlapping business which amounted to less than 10% of the nonunion entities business and had only worked together on 11 projects in a two year time span). As relevant here, Andrus and Sterling did share a common business purpose - carpentry work for more than 28 construction projects.

All of the equipment used by the Andrus employees on the 28 plus double breasted jobs was Sterling equipment. Andrus provided no equipment or tools or support of any kind.  Although carpentry work comprised only 20% of Andrus's business, ninety nine percent of Andrus's carpentry work was for Sterling customers, supporting a finding of an overlapping customer base.

Of greatest significance here is the substantial interrelation of management and operations. Supervision of the 28 plus projects on which Andrus supplied the labor were controlled by Sterling, specifically Mark Bolitho and Sarah Johnston.  Although the businesses as a whole had some independence in these areas, on these projects, there was complete interrelation of management, operations and supervision.  Andrus employees (i.e. those that Andrus hired from Sterling to perform the union work) were told where and when to work by Sterling (Bolitho or his foreman), they used

22

Sterling equipment and tools, they were covered by Sterling health plans, they were supervised by Sterling employees, they submitted time sheets to Sterling, they were paid according to Sterling's (Bolitho's) allocation of their hours.  Andrus had no input on these issues and Alan Andrus never inquired whether his "Sterling/Andrus employees" were getting paid union wages and fringes for all of the covered work they performed for Sterling.  He was not concerned because Bolitho reimbursed him (plus a profit) for every dollar he paid to his employees on Andrus/Sterling jobs.

In addition to exercising complete control over where and when the Sterling/Andrus employees worked, as discussed *supra*, Sterling was solely responsible for preparing the payroll on the jobs on which Andrus and Sterling operated together.  Defendants have provided no explanation for the "revised" time sheets prepared by Sarah Johnston other than vague references to "other non union work" that must also have been performed on the days in question.  Plaintiffs summarize this lack of evidentiary support well in their reply:

> Neither Sterling nor Andrus address the facts set forth in the Funds Brief that the joint employees filled out time cards showing that they worked an entire week on a project for Andrus and were paid for half of the week by Sterling at lower hourly rates, often without overtime and without any fringe benefit contributions for the hours worked for Andrus.  These facts were documented by deposition testimony, time cards, and company accounting documents.  They fail to address these facts because there is no explanation, other than the obvious truth, that they were operating to evade Andrus' fringe benefit obligations.

ECF. No. 57, Pls.' Reply 5.

Although Sterling's intent need not be demonstrated, in this case it is not wholly irrelevant that in a previous case United States District Judge Denise Page Hood (E.D. MI) found that Sterling and Bolitho had run an alter ego operation. (ECF No. 55, Pls.' Resp. Ex. A.) Alan Andrus admitted that he had no concern for whether fringes were being paid on covered work performed by his employees because he was being reimbursed by Bolitho.  Andrus Dep. 33.  Additionally, the

employees testified that they were told to tell union representatives at the job sites that they were not sure what their wage would be because they hadn't yet received their first paycheck. Defendants rely on the fact that the Sterling employees who were "loaned" to Andrus to perform the union work joined the union. This fact, if true, has no bearing on how the two entities operated thereafter to evade the payment of union wages and fringe benefits. Although intent need not be demonstrated, a reasonable trier of fact could infer intent from these facts.

Andrus argues that "it was just a subcontractor to Sterling, nothing more, nothing less." ECF No. 56, Andrus's Resp. 1. But there are no contracts evidencing a subcontract relationship and most subcontractors do not hire the general contractor's employees to do the work, or allow the general contractor to do the timekeeping and payroll computations for the subcontractor's own employees:

> The fact that no contracts or agreements exist between the business detailing subcontracting, rent, etc., is extremely telling in determining alter ego status, as it appears that Phil Liparoto can simply assign whichever name he wants to the job. Without any evidence of contracts or agreements between two businesses which purport to have a contractor/subcontractor relationship, there is no real separation or distinction between the two companies.

*Cement Masons' Pension Trust Fund-Detroit & Vicinity v. F&G Poured Walls, Inc.*, 797 F. Supp. 2d 845, 850 (E.D. Mich. 2011) (Rosen, C.J.).

Defendants assert that nothing in the Andrus CBA precluded Andrus from performing covered work for a nonunion entity. This is correct as far as it goes. But Andrus was required to pay union wages and contribute fringe benefits to the Funds on ALL covered work it performed. Based upon the evidence in the record, it is not at all clear that this is what occurred. In fact, there is compelling evidence to the contrary. Based upon the practice of completing and submitting to Andrus revised time sheets that indicated fewer hours of covered work than the employees themselves reported, there is at the very least a genuine issue of material fact regarding whether all

24

covered work was properly reported to Andrus and properly compensated and fringes paid.  Alan Andrus said this made no difference to him because he was reimbursed to the dollar for every check he cut to a Sterling employee whom he had hired to perform covered work.  But surely Andrus's obligations under the CBA were greater than this.

Based on the evidence in the record, a reasonable trier of fact could conclude that the arrangement between Andrus and Sterling on these 28 plus jobs was "a sham transaction" created to "avoid the obligations of collective bargaining agreement."  If Andrus/Sterling employees were performing union work as non-union Sterling employees on union jobs, the Plaintiffs would be receiving less than that to which they were entitled.  Defendants suggest, without offering supporting evidence, that there would have been sound reasons in each instance for the modified reporting of hours on these jobs and that the arrangement was not in fact a sham created to avoid the obligations of a collective bargaining agreement.  But on this summary judgment record, even viewing the facts in the light most favorable to the Defendants on their cross motion for summary judgment, genuine issues of material fact preclude entry of judgment in their favor on the alter ego issue.

This case is factually similar to *Laborers Pension Trust Fund - Detroit and Vicinity v. Interior Exterior Specialists Const. Group, Inc*., 394 F. App'x 285 (6th Cir. 2010).  In *Interior Exterior Specialists*, the Sixth Circuit affirmed the district court's finding that Interior Exterior Specialists (IES) and The Llamas Group (TLG) operated as alter egos, binding TLG, a nonunion company, to the terms of collective bargaining agreement between IES and the Laborers.  IES was a union subcontractor engaged in painting services and selective demolition work. TLG was formed by the wife of the owner of IES.  TLG is a nonunion general contractor doing a broader range of work.  394 F. App'x at 286.  The Sixth Circuit first rejected IES and TLG's argument that "alter-ego

25

liability cannot exist unless the employer had the intent to evade union obligations *at the time the purported alter-ego entity was formed*." *Id*. at 293 (emphasis in original).  The court clarified that intent is just one of the factors to be considered in the alter ego analysis:

> Appellants argue that alter-ego liability cannot exist unless the employer had the intent to evade union obligations *at the time the purported alter-ego entity was formed*. This, however, is inconsistent with our precedent. In *Allcoast*, the panel weighed the approaches of other circuits and concluded that "a finding of employer intent is not essential or a prerequisite to imposition of alter ego status," but rather, is "merely one of the relevant factors." *Id*. We recently reaffirmed this holding, stating that "evidence of an intent to evade, when it presents itself, is a relevant factor to be considered in determining whether the alter ego doctrine is applicable, ... but it is not essential to the imposition of alter [e]go status." *[Trustees of] Detroit Carpenters [Fringe Benefit Funds v. Indus. Contracting, LLC]*, 581 F.3d [313] at 319 [(6th Cir. 2009) (citing *Allcoast*, 780 F.2d at 581; *Fullerton*, 910 F.2d at 337).

394 F. App'x at 293 (emphasis in original) (alterations added).

The Sixth Circuit noted the significance of the fact that "two IES employees testified that they had received checks from both IES and TLG when working on the same project and that they had used the same vehicles and equipment for both IES and TLG jobs."  *Id*. at 288 n. 4.  United States District Judge David Lawson's findings on the alter ego issue, which were affirmed by the Sixth Circuit on appeal, noted facts that demonstrate how strikingly similar the IES/TLG scheme was to the operation between Sterling and Andrus:

> [T]he plaintiffs allege that IES and TLG shared the same employees and artificially categorized the hours they worked for each company in a way that enabled IES to avoid making all of the fringe-benefit contributions it would otherwise have had to make in the absence of TLG. The plaintiffs contend IES and TLG arranged employees' hours so that overtime hours actually worked for IES would appear as hours worked for TLG; this way, IES would not have to make union contributions in connection with overtime hours. The plaintiffs have offered pay stubs that they claim demonstrate that employees would work forty hours in a one-week pay period (or eighty hours in a two-week period) for IES and then be given paychecks from TLG for the remainder of the pay period so that IES would not have to pay overtime and the accompanying additional fringe benefits.

26

*Laborers Pension Trust Fund Detroit and Vicinity v. Interior Exterior Specialists Const. Group, Inc.*, 479 F. Supp. 2d 674, 685 (E.D. Mich. 2007), *rev'd and remanded on other grounds*, 394 F. App'x 285 (6th Cir. 2010).

Importantly, in finding that IES and TLG were alter egos for purposes of the amounts sought by Plaintiffs in that case, Judge Lawson focused on the substantial overlap of the identities of the two entities on the jobs at issue in that case. *Laborers Pension Fund v. IES and TLG*, No. 04-cv-74514, ECF No. 168, Opinion, Conclusions of Law 11-12 (E.D. Mich. Sept. 30, 2008). Defendants filed a motion asking Judge Lawson to amend his findings of fact and conclusions of law on the alter ego issue, arguing that he had applied the wrong standard in analyzing the alter ego claim because he found only "overlapping" instead of "substantial" identity and analyzed only four of the seven relevant factors. *Id.* ECF No. 171, Defs.' Mot. to Amend Findings of Fact and Conclusions of Law 3-16. Judge Lawson denied this motion and, significantly, the Sixth Circuit affirmed Judge Lawson's ruling on the alter ego issue, expressly rejecting Defendants' argument on this point:

> Although defendants analyze each factor separately to support their argument that TLG was not the alter ego of IES, the law clearly indicates that the test under the alter-ego doctrine is flexible and that no one factor is determinative. [*Industrial Contracting*, 581 F.3d] at 318 ("In applying [the alter ego] factors, no individual factor is outcome determinative; instead 'all the relevant factors must be considered together.'" (quoting *Allcoast*, 780 F.2d at 582)). The record contains substantial evidentiary support for the district court's finding that IES and TLG have substantially identical management, business, purpose, operation, supervision, and ownership.

394 F. App'x at 293-94. The similarities to the allegations in this case are apparent. A reasonable trier of fact could conclude that Andrus served as a vehicle for Sterling to perform work on a union job and to avoid the full measure of obligations that would normally flow from performing that work, "artificially categoriz[ing] the hours [] worked for each company in a way that enabled

27

[Andrus/Sterling] to avoid making all of the fringe-benefit contributions it would otherwise have had to make in the absence of [Sterling]." *IES*, 479 F. Supp. 2d at 685. *See also Dobson*, 237 F. App'x at 46-47 (finding alter ego status despite fact that two entities had only six customers in common and only two areas of overlap in their business operations); *Southern Electrical Health Fund v. Heritage Mutual Ins. Co.*, 147 F. App'x 497, 505-06 (6th Cir. 2005) (finding the related four factor single employer test satisfied during the relevant period where the non-signatory general contractor never owned the subcontractor union entity but did supervise the subcontractor's workers, controlled payroll and determined what payments would be made to the plaintiff pension funds); *Central States, Southeast and Southwest Areas Pension Fund v. Int'l Comfort Pdcts.*, No. 07-cv-00383, 2011 WL 3609553, at *11 (M.D. Tenn. Aug. 16, 2011) (finding four factor single employer test satisfied where there was no evidence of common ownership or common management but substantial evidence that operations were interrelated, at least with regard to the drivers that were hired for the projects on which contributions were due).[4]

---

[4] A concept related to the single employer doctrine but in fact analytically distinct is the "joint employer" doctrine, which has been applied in the context of unfair labor practice claims to determine whether one entity possesses sufficient indicia of control over another entities' employees to be considered a "joint employer" and thus chargeable with the unfair labor practices of that entity. *Boire v. Greyhound Corp*., 376 U.S. 473 (1964). The Sixth Circuit has recognized that the doctrines have often been confused in the opinions of the Sixth Circuit but are in fact analytically distinct:

> Admittedly, the opinions of this circuit have not been entirely clear on the distinction between the concepts of "joint" and "single" employer. While we have not squarely addressed the relationship between the two doctrines, we have on occasion used the term "joint employer," without explanation, when applying the "single employer" test. As other courts have explained, however, these concepts are analytically distinct.
>
> While the single employer analysis involves examining various factors to determine if two nominally independent entities are so interrelated that they actually constitute a single integrated enterprise, the joint employer analysis has been described as

28

follows:

> The basis of the [joint employer] finding is simply that one employer while
> contracting in good faith with an otherwise independent company, has retained for
> itself sufficient control of the terms and conditions of employment of the employees
> who are employed by the other employer. Thus, the "joint employer" concept
> recognizes that the business entities involved are in fact separate but that they share
> or co-determine those matters governing the essential terms and conditions of
> employment.

*Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 n. 4 (6th Cir. 1997) (citations
omitted). "Both the 'single employer' and the 'joint employer' doctrines developed in the labor
relations context and were subsequently imported into the civil rights context." *Id*. at 993 n. 3.

A recent Sixth Circuit Opinion, *EEOC v. Skanska USA Bldg., Inc.*, __F. App'x__, 2013 WL
6486752 (6th Cir. 2013), involving a Title VII claim, found that even though the general contractor
did not employ certain on-site employees directly, the general contractor acted as their joint
employer because the general contractor "set" the sub-employees pay, handled the sub-employee's
time sheets, and supervised them on the job site. This certainly sounds familiar to the facts in the
instant case. The Sixth Circuit held the general contractor liable in that Title VII case pursuant to
a joint-employer theory:

> Entities are joint employers if they share or co-determine those
> matters governing essential terms and conditions to employment. To
> determine whether an entity is the plaintiff's joint employer, we look
> to an entity's ability to hire, fire, or discipline employees, affect their
> *compensation and benefits*, and direct and supervise their
> performance.

2013 WL 6486752, at *3 (emphasis added).

Although there has been no unfair labor practice charge in this case, the evidence suggests that
Sterling and Andrus could also be termed joint-employers:

> 1. Sterling's carpenters were provided to Andrus, which had entered into a CBA with the
> Carpenters Union, to enable Sterling to satisfy the union carpenter job requirement on, *inter
> alia* the Airport job and by running their payroll through Andrus;

> 2. Sterling, through Sarah Johnston, purportedly acting on instruction from Mark Bolitho,
> controlled the decision-making (revising the employee-submitted time sheets) as to how
> many of the carpenters' hours were reported as working for Andrus (CBA higher wages and
> benefits) and how many hours were reported as working for Sterling;

Importantly, the Sixth Circuit has emphasized that no one factor is determinative in the alter ego analysis. "In applying [the alter ego] factors, no individual factor is outcome determinative; instead 'all the relevant factors must be considered together.'" *Industrial Contracting*, 581 F.3d at 318 (quoting *Allcoast*, 780 F.2d at 582) (alteration added). In this case, there is compelling evidence that could lead a reasonable trier of fact to conclude that Sterling completely controlled Andrus with regard to 28 plus jobs on which the two entities engaged in a joint operation. Although no common

---

3. Sterling provided the carpentry tools and the supervision. Indeed, "drilling down" further, when viewing the facts in the light most favorable to Plaintiffs, the Sterling-Andrus arrangement could be described as a conspiracy between them to use Andrus to assist Sterling in (a) receiving funds from a union job that it did not qualify for, and (b) violating federal labor law by failing to pay union benefit payments required under the CBA by "cooking the books" through the creation of alternate time sheets. For example, when carpenter James Walker turned in his time sheet reflecting 40 hours of union time and two hours of union overtime, Sara Johnston created an "alternate" time sheet that reflected only 18 hours of union work. (Pl.'s Resp. Ex. 8.) Based on the evidence presented on summary judgment, a reasonable trier of fact could conclude that this conduct, on the part of both Sterling and its puppet Andrus, was intended to deprive the union employees of their rightful benefits under the CBA and the Plaintiffs of the contributions to which they were entitled.

Plaintiffs have not asserted an unfair labor practice claim against Defendants and the Court is aware that there is some question whether a finding of "joint employer" status, as opposed to "single employer" or alter-ego status, would be sufficient to bind a non-signatory employer to a collective bargaining agreement and hold them responsible for fringe benefit contributions. *See Central States, Southeast and Southwest Areas Pension Fund v. Int'l Comfort Pdcts, LLC*, No. 07-cv-00383, 2011 WL 3608553, at *10 n. 20 (M.D. Tenn. Aug. 16, 2011) (noting that "all of the on-point Sixth Circuit cases," while sometimes confusing the word "joint" with "single," in fact applied only the single employer factors in cases seeking to bind non-signatories to the terms of collective bargaining agreement and never relied on the less stringent joint employer theory); *Trustees of the Screen Actors Guild-Producers Pension and Health Plans v. NYCA, Inc.*, 572 F.3d 771, 776-77 (9th Cir. 2009) (declining to extend the joint employer theory to bind a nonsignatory to a CBA liable for pension contributions); *Olivieri v. P.M.B. Construction, Inc.*, 383 F. Supp. 2d 393, 403-04 (E.D.N.Y. 2005) (concluding that a finding of joint employer status, as opposed to alter ego status, is insufficient to hold a nonsignatory to a CBA liable for fringe benefit contributions). Nonetheless, these facts bear mention.

ownership has been established here, certainly the importance of common ownership lies in part in its tendency to indicate common control, and here there is evidence that Sterling completely controlled Andrus and was able to direct Andrus to use Sterling employees, who would operate under Sterling's control, to do union work on which only Andrus could bid, and who would be paid according to hours worked as reported wholly by Sterling, apparently without regard to the time sheets submitted by employees. Importantly, the evidence establishes that with one exception, Andrus had never performed carpentry work before Sterling directed Andrus to set up for carpentry work using Sterling employees. A question of fact exists as to whether Andrus let itself be used by Sterling so that the Sterling/Andrus operation evaded the full measure of Andrus's obligations under the CBA by blindly relying upon Sarah Johnston, a Sterling employee, to calculate, and recalculate, in reporting the number of union hours worked on the Andrus/Sterling jobs.

Defendants argue that "[t]he union got the full benefit of its bargain," but Plaintiffs have presented evidence that the Sterling-borrowed Andrus employees filled out time cards indicating a certain number of hours worked on a project for Andrus and then, through manipulation of their time sheets by Sterling who exercised complete control over how these Andrus employees' hours were allocated, they were paid for portions of those reported hours by Sterling (at nonunion wages and without fringe benefit contributions) and portions of those hours by Andrus (at union wage and with fringe benefit contributions). When asked at his deposition about the altered time sheets, Bolitho could not explain the breakdown and agreed that if the project called for union only labor, Sterling employees would not be able perform work on the project. While Defendants surmise that Bolitho might have had legitimate and defensible reasons in each instance for separating the work into union and nonunion, they failed to present sufficient evidence to support this assertion such that the Court

31

could conclude that no reasonable trier of fact could believe Plaintiffs' version of the facts on this issue supported by the employees' testimony, i.e. that the Andrus/Sterling employees worked far more union hours than Sterling reported to Andrus.

At bottom, the question that must be answered is whether the two entities were operating in such a way that Andrus's obligations under its CBA were not fully met. To the extent that the Sterling/Andrus employees were doing covered work but being paid non union wages, there was a loss of union work to the double breasted operation and a loss of fringe benefits paid. Such an operation, if found to exist, creates a potent threat, indeed a certainty, that union members will have lost traditional work to a nonunion doublebreast. *Becker,* 927 F.2d at 899. The Funds' expert calculates that this practice, based upon the 28 plus projects he audited on which the two entities operated in this manner, resulted in a fringe benefit liability in excess of $250,000 in unpaid fringe benefit contributions for covered carpentry work. (Pls.' Resp. Ex. L, Reeves Aff. ¶ 20.)

## IV.    CONCLUSION

The Court concludes that genuine issues of material fact remain on the issue of whether Sterling and Andrus were engaged in a double breasted operation that jointly established a scheme to evade Andrus's obligations under the CBA and thereby deprive the Plaintiffs of fringe benefit contributions on covered work to which they were entitled and whether, therefore, Sterling should be bound by the Andrus CBA on work performed by the entities together on covered carpentry work.[5]

---

[5] The Court also rejects Defendants argument that the CBA dictates that Tennessee law governs and Tennessee is a right to work state, making it unlawful to require union membership and to exclude workers who refuse to join the union. ECF No. 54, Sterling's Resp. 8. Defendants offer no legal support for this argument and Plaintiffs responded that the United States Supreme Court has held that right-to-work laws cannot void agreements with regard to an employment relationship whose

Accordingly, the Court DENIES both parties' motions for summary judgment. To the extent that Plaintiffs require access to the books and records of Sterling in order to determine the full extent of the joint operation, the Court ORDERS Sterling to produce the relevant books and records for the period beginning January 1, 2008 up to the present.

IT IS SO ORDERED.


s/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: April 30, 2014

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 30, 2014.


s/Deborah Tofil_____
Case Manager

---

principal job situs is outside of the right-to-work state. *See Oil, Chemical & Atomic Workers Int'l Union, AFL-CIO v. Mobil Oil Corp.*, 426 U.S. 407, 414 (1976). Defendants filed no reply to Plaintiffs' response.