UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE DETROIT
CARPENTERS FRINGE BENEFIT
FUNDS,                                                          Case No. 11-cv-14656

                              Plaintiffs,                       Paul D. Borman
                                                                United States District Judge

v.

ANDRUS ACOUSTICAL, INC.,
a Michigan Corporation, STERLING
MILLWORK, INC., a Michigan
Corporation, ALAN ANDRUS, an
individual, and MARK BOLITHO,
an individual, jointly and severally,

                              Defendants.
_____/

AMENDED[1]FINDINGS OF FACT AND CONCLUSIONS OF LAW
FOLLOWING BENCH TRIAL ON ALTER EGO LIABILITY

In this labor employment benefits litigation,[2] Plaintiffs, Trustees of the Detroit Carpenters

Fringe Benefit Funds (Plaintiffs or "the Funds"), claim that the Defendants Andrus Acoustical, Inc.

("Andrus" or "Andrus Acoustical") and Sterling Millwork, Inc. ("Sterling"), Alan Andrus, and Mark

---

[1]  The only change to the Court's original Findings of Fact and Conclusions of Law appears in the last sentence of the Court's Conclusion.

[2]  Plaintiffs filed this action pursuant to their standing "as a trust fund established pursuant to the Labor-Management Relations Act of 1947 ("LMRA") as amended, 29 U.S.C. § 141 *et. seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 *et. seq.* . . . ."  Plaintiffs Complaint Dkt. #1, 10-21-11 ¶ 1.

1

Bolitho ("Bolitho") ran an alter ego operation to avoid the fringe benefit obligations of Andrus's Collective Bargaining Agreement ("CBA") with the Michigan Regional Council of Carpenters (the "Union").  Plaintiffs claim that the alter ego entity of Andrus/Sterling has failed to make proper fringe benefit contributions to the Plaintiffs and seek an audit, accounting and liquidated damages pursuant to the CBA and ERISA.  Defendants respond that Sterling is a separate business entity, in a different business than Andrus, and denies that the two companies are alter egos.

This matter came before the Court for a non-jury trial as to alter ego liability only on October 6, 2015 through October 9, 2015.  The parties have submitted post-trial Proposed Findings of Fact and Conclusions of Law.  ECF Nos. 84, 85.  The Court now finds the following facts and applies the following governing law to conclude that Plaintiffs have established that between the years 2008-2011, Andrus and Sterling conducted an alter ego operation on a significant number of projects, depriving the Funds of the full measure of fringe benefit contributions to which they were entitled.

## I. Findings of Fact

The following factual findings are based on the testimony of the witnesses, the exhibits introduced at trial and the parties' stipulations.

1. The Court has jurisdiction over this matter pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 1132(a)(2) and § 1145 ("the LMRA").  Stipulation of Fact No. 1.

2. The Plaintiffs are trustees of trust funds established under and administered pursuant to Section 302 of the Labor Relations Management Act of 1947, as amended, 29 U.S.C. § 186, and the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* Stipulation of Fact No. 2.

2

*Andrus and Sterling: Company Profiles*

3.  Andrus Acoustical has been operating under a CBA with the Union continually since 1992.  Vol. III at 8-9, Exhibits 100-103.

4.  Andrus has not terminated the 1992 CBA or any subsequent CBA with the Union, the most recent of which became effective on June 1, 2012.  Vol. III at 8, Exhibit 103.

5.  The Andrus CBAs contain an Alter Ego/Successor Provision that states:

> **AlterEgo/Successor Entities.**  If and when the Employer shall perform any work of the type covered by this Agreement at the site of a construction project, under its own name or under the name of another, as a corporation, company, partnership, or any other business entity, including a joint venture, wherein the Employer (including its officers, directors, owners, partners, or stockholders) exercises either directly or indirectly (such as through family members) any significant degree of ownership, management, or control, the terms and conditions of this Agreement shall be applicable to all such work and to such successor or alter ego entity.  Exhibits 101-103, Sec. 5.4

6.  The Andrus CBAs contain a provision prohibiting a signatory from subcontracting work to a contractor who is not bound by the CBA:

> **Subcontracting.**  No Employer shall subcontract or assign any of the work described herein which is to be performed at a job site to any contractor, subcontractor or other person or party who fails to be bound by this or other applicable Union agreements . . . The Employer agrees that it will be a surety for nonpayment of delinquent wages and fringe contributions due and payable on all covered work which has been subcontracted and will promptly pay any such amounts not otherwise timely paid by the Employer's subcontractor(s).  Signatory Employer further agrees to promptly pay the difference of all wages and fringes to Employees in the event a subcontractor is used that fails to pay the proper wage and fringe benefit rate.  Exhibits 101-103, Section 5.1

7.  The Andrus CBAs required Andrus to make specified fringe benefit contributions to the Plaintiff Funds for all covered carpentry work performed by Andrus.  Exhibits 101-103, Sections 1.2 and 10.1.

8.  Alan Andrus, the President and sole owner of Andrus, understood that Andrus was

3

required to pay fringe benefits for all of the hours of covered carpentry work performed by its employees and that it is prohibited from subcontrating covered carpentry work to a contractor that is not a signatory to a CBA with the Union.  Vol. III at 9.

9.  Alan Andrus runs Andrus out of his home.  Andrus had a total in sales for 2008-2011 of just under $2 million.  Vol. III, 3, 67-68; Vol. IV, 38.

10.  Sterling, which occupies a 25,000 square foot facility in Farmington Hills, is owned by Mark Bolitho and his wife, Nancy.  Neither Alan Andrus nor any of his relatives has ever had an ownership interest in Sterling.  Vol. IV, 26-27.

11. Sterling is not currently, and was not during the years 2008-2011, a signatory to a CBA with the Union.  Vol. III at 3.

12.  Sterling performs carpentry work, drywall, metal studs, acoustical ceilings, millwork installation.  Vol. II, 62-63.

13.  30% of Sterling's revenues are from millwork (cabinetry and furniture built on site at Sterling's facilities), 35% from carpentry and the balance is general contracting work.  Vol. II, 64; Vol. IV, 40.

14.  Sterling's sales for 2008 were $10,321,000; for 2009 $10 million; for 2010 $6,885,000; and for 2011 $6,765,000.  Vol. IV, 8-11; Exhibits 515-518.

15.  Sterling employs between 60-70 people and hires hundreds of subcontractors.  Vol. IV, 27.

16.  Sterling has more than a million dollars worth of equipment and maintains its own website, phone and fax.  Vol. IV, 27-28.

17.  Sterling was incorporated in 1990 and has been adequately capitalized, files its own tax

returns, has its own bank accounts and pays its own bills separate from its owners Mark and Nancy Bolitho.  Vol. IV, 11-12; Exhibit 513.

18.  Bolitho is responsible for bidding all Sterling jobs and deciding how to staff them.  Vol. II, 64.

19.  Andrus Acoustical typically performs only acoustical ceiling work. Vol. III 6-7.

20.  All acoustical ceiling work was considered covered carpentry work under the Andrus CBAs.  Vol. III at 14.

21.  Mark Bolitho understood that Sterling, a nonunion shop, could not bid on a union job and use its own work force to do the labor without signing a CBA.  When Sterling bid a job that required union labor, they would a hire a union subcontractor to do the work.  Vol. II, 62, 67.

22.  In 1989, Bolitho was accused of forming an alter ego corporation to avoid paying fringe benefits to the Carpenters Fund.  Bolitho formed a company called Sterling Construction in 1989 and signed an agreement with the Union to "try a union avenue for a year" but it didn't work out so the company was dissolved and then Bolitho was sued.  A Detroit Federal District Court Judge determined that Bolitho then began operating Sterling Contracting as an alter ego to evade fringe benefits. *Trustees of the Carpenters' Pension Trust Fund v. Bolitho, et al.*, No. 93-cv-74427, ECF No. 53 (E.D. Mich. Oct. 30, 1998) (Findings of Fact and Conclusions of Law).  While the case was on appeal to the United States Court of Appeals for the Sixth Circuit, the parties settled and Sterling Construction paid the Funds $35,000.  Vol. II, 74-75; Exhibit 155, Findings of Fact and Conclusions of Law; Exhibit 522, Settlement Agreement.

23.  Since the 1989 lawsuit, Sterling has remained a nonunion company and looks for and tries to bid only on nonunion work.  If there is a piece of a job that requires union work, Sterling will

5

subcontract that portion out to a union shop but generally speaking Sterling does not look to do union work. Vol. II, 86-87.

***Sterling Bids Jobs Requiring Union Labor, and Recruits Andrus to Hire Sterling Employees to Perform the Work***

24.   During the years 2008-2011, Andrus and Sterling worked together on several projects involving carpentry work, including the jobs at Laurel Park Place Mall, the Detroit Metropolitan Airport, and Plum Market which, among others, are the subject of this action. Andrus had never performed carpentry work other than acoustical ceilings until it undertook to perform the carpentry work with Sterling in 2008.   99% of Andrus's work over the years has been acoustical ceilings. Vol. III at 6-7; Exhibit 154.

25.   Because these project jobs required union labor, which Sterling was unable to perform as a nonunion shop, Bolitho called Alan Andrus and asked if Andrus wanted to do some carpentry work. Andrus had never done carpentry work before and didn't have employees to do the work. Bolitho suggested that Andrus use Sterling employees to perform the work. Alan Andrus agreed to the arrangement but told Bolitho that the Sterling men would have to join the Union to work for Andrus on the jobs. Andrus sent a handful of Sterling carpenters to the Union hall to join the Union and created a letter of hire taking on the Sterling workers as employees of Andrus Acoustical (the "Andrus/Sterling" employees). Vol. III, 10-11.

26.   The subcontract (subpart "bb") with contractor EMJ for the Laurel Park job required "full union compliance for all work performed under" the subcontract with Sterling. Exhibit 121, p. 10; Exhibits 122-24; Exhibit 164.

27.   According to Andrus/Sterling employee Dwayne Hill, the foreman on the Laurel Park job, the entire Laurel Park job was union work being performed for Andrus and nobody performing

6

any carpentry work on the Laurel Park job was working for Sterling.  Dwayne Hill supervised all of the Andrus/Sterling employees on the jobs he ran for Andrus.  Vol. I, 67-69.

28.   The EMJ Project Manager for the Laurel Park job, Adam Graves, in his *de bene esse* deposition, testified that he was not involved in negotiating the subcontract between Sterling and EMJ but he interpreted paragraph "bb" as requiring the subcontractor to be fully union compliant, to have full compliance with union rules.  Exhibit 120, Graves Trial Dep. 11.

29.   Graves did not know of any work that Sterling performed on the Laurel Park job that was not required to be fully union compliant but didn't know if EMJ allowed for any nonunion work to be performed on the Laurel Park job.  He never approved Sterling performing any nonunion work on the Laurel Park job, nor was he aware whether EMJ had a contract with any union for the Laurel Park job.  Exhibit 120, Graves Trial Dep. 13-14, 23, 24-25.

30.  Graves was not involved in negotiating the EMJ/Sterling subcontract for the Laurel Park job but he was familiar with the terms of that subcontract.  Exhibit 120, Graves Trial Dep. 8, 26

31.   Sterling did the framing, metal stud frames, drywall, acoustical ceiling work and rough and finish carpentry work on the Laurel Park job.  Exhibit 120, Graves Trial Dep. 8-9.

32.   Sterling was not permitted to subcontract any of the work on the Laurel Park project without obtaining the permission of EMJ.  Exhibit 121, p. 3 ¶ 6.

33.   Sterling never requested to subcontract parts of its contract with EMJ.  Exhibit 120, Graves Trial Dep. 9,

34.   Paragraph 20 of the EMJ subcontract with Sterling requires a written change order for any extra work performed at Laurel Park.  Exhibit 121, p. 5.

35.   When Sterling provided written change orders to EMJ for extra work, the Sterling

proposal explicitly stated: "We are pleased to submit herewith our proposal to furnish all **union** labor." (Highlighting in original proposal). *See, e.g.*, Exhibit 122.

36. Graves understood that in such proposals Sterling was making it clear that they were using all union labor for the extra work. Exhibit 120, Graves Trial Dep. 13.

37. Graves was not familiar with Andrus Acoustical, was not sure if their employees worked on the Laurel Park project and Andrus did not have a contract with EMJ to work on that job. Exhibit 120, Graves Trial Dep. 21.

38. Graves testified that he did not approve Sterling to perform any nonunion work on the Laurel Park project. Exhibit 120, Graves Dep. 24, 25.

39. Bolitho did not obtain permission from EMJ to subcontract any of the work on the Laurel Park project. Vol. II, 72.

40. Bolitho did understand that the extra work orders issued on the EMJ job required "all union labor." Vol. II, 73-74; Exhibit 123.

41. Mark Bolitho did not believe that "full union compliance for all work performed" under the EMJ contract required him to use all union labor on the job. Vol. II, 72.

42. Bolitho testified that when Sterling bid the Laurel Park job, they were told it was nonunion. Bolitho has no explanation for the language of subparagraph "bb" of the subcontract that required "full union compliance." He thinks maybe it "relates to safety issues." Vol. II, 91-92.

43. Bolitho testified that the Laurel Park job was bid as "an open shop" project but after Sterling started the job, there were picketers and EMJ asked if they could have some union compliance on the job. Vol. II, 92.

44. According to Bolitho, after Sterling had started the job, there was a strike on the job and

EMJ came to him and asked if they could have some union compliance on the job and he agreed to subcontract some work to a union shop.  Vol. II, 92.

45.   Graves, the EMJ project manager, testified that he had experience with picketers on "other" jobs, but had no experience with picketers on the Laurel Park job and did not know whether EMJ received contact from the unions about the Laurel Park project during its administration. Exhibit 120, Graves Trial Dep. 30, 34-35.

46.   The Detroit Airport job also required Sterling to "furnish all union labor."  *See, e.g.*, Exhibit 137.

47.   Phil Bax, the Andrus/Sterling employee who was instructed by Bolitho to serve as the foreman on the Detroit Airport job, testified that all of the carpentry work on the jobs within the airport, of which there were seven, was union work performed by Andrus with workers paid for by Andrus.  At trial, Bax confirmed that there were *never* times on the airport jobs where the carpentry work was being done partially by Andrus (union) and partially by Sterling (nonunion) employees. Vol. II, 6, 7-8, 14-15.

48.   Bolitho testified that there were seven different jobs at the Detroit Airport and he did not recall that all of the jobs required union labor.  According to Bolitho, some of the carpentry work at the Airport job was performed by Sterling carpenters, not Andrus/Sterling carpenters.  Vol. II, 66-67, 69.

49.   Bolitho testified that Sterling was hired by two different contractors to do the airport work and he recalled generally that some of the projects required union labor and some did not.  Vol. II, 90-91.

***Andrus Has No Involvement Whatsoever With Supervising the Andrus/Sterling Employees or Tracking Their Union Hours***

50.  Exhibit 154 lists all of the jobs that Andrus Acoustical performed between 2008-2011 with Sterling.  The jobs listed on Exhibit 154 were all union jobs.  (Hereinafter the "shared union jobs" or "Andrus/Sterling projects".)   All of the carpenters that worked for Andrus on the nonacoustical ceiling work listed on this Exhibit came from Sterling.  This Exhibit lists the payments received by Andrus from Sterling, reflecting the totals for each shared union job.  Vol. III, 18-19.

51.  The "Andrus/Sterling" employees were employees of Andrus when they worked on the Andrus shared union jobs.  Andrus issued them their paychecks.  They weren't working for Sterling when they were working for Andrus and Alan Andrus understood that they had to be union employees to work on each of these jobs.  Vol. III, 11, 18; Exhibit 154.

52.  All of the carpentry work that the Andrus/Sterling employees did for Andrus was on union jobs that required all carpentry work to be done at a union rate by union employees.  Vol. III, 20.

53.  Alan Andrus understood that these Andrus/Sterling employees could not be union employees while doing work for Sterling because, as a nonunion shop, Sterling could not pay CBA required fringe benefits on the work.  Vol. III, 12.

54.  When these Andrus/Sterling employees were working for Andrus they were supervised solely by Sterling foremen, Sterling and the Andrus/Sterling employees supplied Sterling tools and equipment and materials, used Sterling credit cards for materials and gas; Andrus paid nothing for any of these items.  Vol. III, 12; Vol. II, 68-69.

55.  When Andrus had done acoustical ceiling work for Sterling before beginning these shared union jobs in 2008 doing carpentry work with Sterling employees, Andrus used its own

10

employees, materials, and equipment. Andrus employees would report their hours to Alan Andrus, he would track their hours and pay their benefits. Alan Andrus would send Sterling an invoice prepared solely by Andrus and Sterling would send him a check. Andrus would typically get paid in 30-90 days. Sterling had no involvement in the process other than sending Andrus a check for the amount that Andrus invoiced based on Andrus's calculation of its own employees hours. Vol. III, 12-13.

56.     On the other hand, when Andrus was doing this carpentry work for Sterling on these shared union jobs that required union labor, the employees would report their hours (either by calling them in or more regularly by turning in hand written time sheets) to Sarah Johnston, who was employed by Sterling as Sterling's head of payroll, human resources and office management. Ms. Johnston never worked for and was never paid by Andrus. Ms. Johnston would email Alan Andrus the workers' time sheets, or would create an Excel report from the time sheets they submitted to her, and would instruct Alan Andrus how many hours each man had worked on the shared union jobs. Alan Andrus would create a payroll according to Ms. Johnston's numbers and would invoice Sterling. Ms. Johnston would then electronically transfer ("ACH") the funds into Andrus's bank account immediately after she received the invoice. Vol. II, 22-23; Vol. III, 14-15, 25.

57.     After Andrus received the ACH from Ms. Johnston, Andrus would pay the Andrus/Sterling employees. So, in some instances, Andrus was paid the day before he paid his employees - he received the ACH the day before he paid the employees. But typically Ms. Johnston would send hours on Monday-Wednesday, Alan Andrus would do payroll on Wednesday, and the carpenters would get checks on Friday. Vol. III, 16-17; Exhibit 116, pp. 000283-285.

58.  Alan Andrus has no idea who the Andrus field employees reported to on these jobs -

none of the foremen reported to him - neither Phil Bax or Dwayne Hill.  Vol. III, 16.

59.  Andrus worked with Sterling under this joint arrangement on each of the shared union jobs between 2008-2011.  All of the carpenters who did carpentry work for Andrus on the shared union jobs were from Sterling and none of the Sterling carpenters who came to work for Andrus had ever worked for Andrus before.  Vol. III, 18-19; Exhibit 154.

60.  If the carpenters were working for Andrus it was necessarily a union job because all of the carpentry work that Andrus does must be union work and all of the work Andrus did for Sterling was union work that required him to use union workers, pay union wages and fringe benefits.  Vol. III, 19-20.

61.  If these workers were doing other work that they weren't reporting to Alan Andrus, he wasn't worried because he had no idea what was going on the job sites and he had no way to know if the hours Ms. Johnston was reporting to him actually were the full measure of union work performed.  Vol. III, 20-21.

62.  Alan Andrus just "trusted" Sterling and he was only concerned that he got paid for the hours (including markup) that Ms. Johnston sent to him so he could pay employees for those hours, and pay fringes, and didn't feel an obligation to track those hours himself.  That was "Sarah's job" so why not let her do it.  Vol. III, 22.

63.  On all other jobs he had done with Sterling in the past, when Andrus was hired as a subcontractor to do acoustical ceiling work, he used his own employees and they did not report their hours to Ms. Johnston - they reported them to Alan Andrus and he paid them.  Vol. III, 22-23.

64.  Andrus has never worked with any other contractor, other than Sterling, that would dictate to Alan Andrus the hours that his own employees had worked and Andrus has never used the

12

employees of other contractors to perform carpentry work on any other jobs.  Vol. III, 37.

65.  Andrus did nothing on these shared union jobs other than create a payroll blindly from Ms. Johnston's numbers and pay the Andrus/Sterling employees per Ms. Johnston's instructions. Vol. III, 25.

66.  Alan Andrus understands that he cannot subcontract any work to a nonunion contractor, cannot pay less than union scale on any job, cannot work half of a job union and the other half nonunion, can't do drywall at a union rate and studs at a nonunion rate.  Vol. III, 25.

67.  Andrus had two relationships with Sterling - one where Andrus acted as subcontractor doing acoustical ceiling work for Sterling as had occurred prior to 2008 and one where Andrus was a subcontractor that just provided labor, as occurred on the shared projects performed between 2008-2011.  When doing acoustical ceiling work for Sterling, Andrus used his own men and materials. When he subcontracted just labor, i.e. when he hired Sterling carpenters to do Andrus union work, he only provided the men not the equipment and materials.  Vol. III, 42-43.

68.  Alan Andrus could not recall ever having subcontracted labor to anyone other than Sterling and if he did it was "rare."  Vol. III, 51.

69.  Not all of the jobs done by Andrus for Sterling between 2008-2011 involved the subcontracting of carpentry labor.  Vol. III, 43-44; Exhibit 154.

70.  Eight of the shared projects involved carpentry work and nineteen involved acoustical ceiling work.  Vol. III, 44-45.

71.  Andrus provided labor subcontracting for Sterling on 7 or 8 projects between 2008-2011: DSW Shoes, Detroit Airport phases 1-3, Laurel Park, Plum Market West Bloomfield and Plum Market Ann Arbor and during that same period subcontracted 19 acoustical ceiling jobs.  Vol. III,

45; Exhibit 154.

72.   Andrus had no written subcontracts with Sterling for the labor or the acoustical ceiling work.  Vol. III, 50-51.

73.   As a union contractor, Andrus could work for anyone it chose but was required to pay fringe benefits on all work it performed.  Vol. III, 51.

***The Andrus/Sterling Employees Submitted Their Time Sheets to Ms. Johnston, Indicating The Hours That They Worked on the Union Jobs, Unaware that Sterling Thereafter Created Alternate Time Sheets, Decreasing the Number of Union Hours That the Employees Had Reported and Attributing Those Hours to Work Performed for Sterling at Sterling Pay Rates, And Directing Andrus to Pay the Andrus/Sterling Employees According to the Reduced Hours on the Alternate Time Sheets.***

74.   Matt Forester started working for Sterling in July, 2003, doing steel studs, drywall, ceilings and hardware – mainly carpentry work.  Vol I, 13.

75.   In 2008 he was instructed by Mark Bolitho and Phil Bax to join the Union and become an employee of Andrus Acoustical so that he could do carpentry work on the Detroit Airport job. He was required to join the Union to be able to work for Andrus on the Detroit Airport jobs because as an employee of Sterling, a nonunion shop, he could not join the Union.  Vol. I, 14-15.

76.   Forester did the same carpentry work for Andrus that he did for Sterling and he used Sterling equipment on the Andrus jobs - all the same tools which were marked with "SMI" on the tool, and was supervised by Phil Bax, a Sterling employee.  Vol. I, 14-16.

77.   Forester's weekly time slip for the week ended June 15, 2008, that he filled out himself, shows 24 hours worked at "union scale" for Andrus Acoustical on the Detroit Airport job and 8 hours worked for Sterling "Sterling scale" at a different job site that had nothing to do with Andrus. Vol. I, 17; Exhibit 138.

78.   A different time sheet prepared by Sterling for the week June 15, 2008, filled out by

14

someone other than Forester in handwriting that Forester did not recognize, showed him working only 16 hours that week, 8 at union scale on the Airport job for Andrus and 8 at another job site. This time sheet shows Forester was being paid $26/hour.  Vol. 1, 18; Exhibit 139.

79.  Forester's Andrus Acoustical check stub for the week ending June 15, 2008 shows that he was in fact paid union scale wage of $30.16 for only 16 of the 24 hours of union work he performed for Andrus that week.  Vol. I, 18-19; Exhibit 140.

80.  Sterling's payroll for the week ending June 15, 2008 shows that Forester was paid for 14 hours at $17/hour, a nonunion wage.  Vol. I, 19; Exhibit 141.

81.  Forester's time sheet for the week ending September 14, 2008 shows he worked 61 hours for Andrus on the Airport job that week.  All of those hours were for work performed for Andrus. Vol. I, 26; Exhibit 170, p. 000717.

82.  Andrus's general ledger shows that it did not pay Matt Forester for any hours the week ending September 14, 2008.  Exhibit 191, pp. 001712-13.

83.  Sterling payroll records for the week ending September 14, 2008, show that Matt Forester was paid for 54 hours at $26/hour and 6 overtime hours at $52/hour.  Exhibit 172, p. 000853.

84.  At first Forester did not ask why he was receiving two checks for his work on the airport job, but when he did ask his foreman, Phil Bax, and Bolitho, Bolitho said Forester was getting two checks because on one Sterling was having to pay into the union and Phil Bax said "What do you care, you are making more money now."  Vol. I, 20.

85.  The Union business agent on the airport job was asking Forester and other Sterling workers what their wages were and Bax told Forester to tell the Union guy that they had not received

paychecks yet and didn't know what amount they were making. Vol. I, 20-21.

86.  Forester's time sheet for the week ending June 29, 2008, shows that he worked 32 hours at the Laurel Park job and 8 hours at the Detroit Airport job, and he totaled the hours "Andrus Acoustical 40" at the bottom of the time sheet.  Vol. 1, 24-25; Exhibit 170, p. 000549.

87.  Although all 40 hours that Forester worked that week were for Andrus on union jobs, and Forester turned this time sheet in to Ms. Johnston at Sterling indicating his all-Andrus hours, an alternate time sheet for the week ending June 29, 2008 indicates a nonunion rate of $26/hour for the 40 hours of work that he performed for Andrus.  Vol. 1, 24-25; Exhibit 549.

88.  Sterling's payroll for the week ending June 29, 2008, shows that Forester was paid for 16 hours at $26/hour.  Exhibit 172, p. 000818.

89.  Andrus's general ledger shows that Forester was paid $506.98 (approximately 16 hours at $30.16/hour) on July 4, 2008 for the week ending June 29, 2008.  Exhibit 191, p. 001709.

90.   Forester's time sheet for the week ended July 6, 2008 shows work performed for both the Detroit Airport job and the Laurel Park job - both of which were union jobs he was working through Andrus.  This time sheet lists 29 and a half hours for Andrus and 8 for Sterling - the eight Sterling hours were for holiday pay which Forester continued to receive from Sterling while working for Andrus.  Vol. I, 21-22; Exhibit 170, p. 000480.

91.  A different time sheet for the same week not prepared by Forester lists 37 and one half hours worked "@ union rate $26."  Vol. I, 22; Exhibit 170. p. 000481.

92.  Forester's Sterling pay stub for the week ending July 6, 2008 shows he was paid for 29 and a half hours at $26/hour (this was a rate lower than the rate he received when working for Andrus even though these were Andrus hours) and 8 hours holiday pay at $17/hour.  Vol. I, 22-23;

16

Exhibit 170, p. 000482.

93.     Matt Forester received $17/hour when he was working for Sterling except when he was working on the Laurel Park or airport jobs as an Andrus/Sterling employee when he would receive $26/hour from Sterling.  Vol. I, 35-36.

94.  Forester believed that Sterling was paying him $26/hour on the Airport job and Laurel Park to "keep him quiet."  Vol. I, 35, 37.

95.  Forester received $30.16 an hour when he worked for and was paid by Andrus on the Airport or Laurel Park jobs and also received fringe benefits paid to the Funds for the hours allocated to Andrus.  Vol. I, 37, 42.

96.  Forester's time sheet for the week ending September 14, 2008 shows that he worked 61 hours for Andrus on the Airport job that week, some of it "doubletime."  Vol. I, 26, Exhibit 170, p. 000717.

97.  In handwriting not Forester's, this time sheet for the week ending September 14, 2008 indicates 54 hours at $26/hour and 8 hours "double" at $56/hour.  Exhibit 170, 000717.

98.  Andrus's general ledger shows that it did not pay Forester for any hours for the week ending September 14, 2008.  Exhibit 191, 001712-13.

99.  Sterling's payroll records for the week ending September 14, 2008, show that Forester was paid for 54 hours at $26/hour and 6 overtime hours at $52/hour.  Exhibit 172, 000853.

100.  Forester agreed that part of a foreman's job would be to supervise subcontractors.  Vol. I, 33.

101.  Forester understood that Sterling was also doing work at Laurel Park but he did not have an understanding of the arrangement between Andrus and Sterling.  Vol. I, 39.

17

102. James Walker is a Sterling employee who has worked for Sterling for 15 years.  Vol. I, 55-56.

103.  Dwayne Hill was his foreman back in 2008-2011and Walker became an employee of Andrus during that time because Dwayne asked him to work for Andrus.  Vol. I, 57-58.

104.  Walker's time sheet for the week ended June 15, 2008, which he would have turned in to Dwayne Hill, shows that he worked on the Laurel Park job all week and logged 42 hours "Union/Andrus" and two overtime hours.  Vol. I, 58; Exhibit 125.

105.  Walker did not recognize an alternate time sheet for that same week that was prepared, not in his handwriting, indicating he worked 18 hours "union" at $26/hour and 7 hours at $7/hour. Vol. I, 59; Exhibit 126.

106.  Sterling payroll records for the week ending June 15, 2008 show that Walker was paid for 25 of the "union" hours by Sterling.  Exhibit 127.

107.  Andrus's payroll records for the week ending June 15, 2008 show that Walker was paid for 24 of the 40 "union" regular hours and for none of the two overtime hours.  Exhibit 128.

108.  Dwayne Hill was the foreman on the Laurel Park job and he ran the job for Andrus. He performed the same type of work for Andrus that he performed for Sterling and used his Sterling credit card, equipment and Sterling van on the Laurel Park job.  Vol. I, 68, 71.

109.  Hill had authority over all of the carpenters on the Laurel Park job and all of the carpenters were working for Andrus.  None of them was performing any carpentry work on the Laurel Park job for Sterling.  Vol. I, 68-69.

110.  Hill never worked for Sterling when he worked on the Laurel Park job.  67.

111.  Hill faxed his time sheets for the Laurel Park job in to Ms. Johnston at the Sterling

18

office.  Vol. I, 68.

112.   To his knowledge, no one was performing any carpentry work on the Laurel Park job for Sterling and he never worked for both Sterling and Andrus on the same day.  Vol. I, 69.

113.   Hill's time sheet (filled out by him and faxed to Ms. Johnston) for the week ending June 15, 2008 shows 40 regular hours and 9 overtime hours for work performed on the "LPP" or Laurel Park job.  Andrus would have paid him for all of the 49 hours he worked for Andrus this week. Vol. I, 70; Exhibit 132.

114.   Hill did not recognize an alternate time sheet, prepared by someone other than him, for the week ending June 15, 2008, that indicates a different categorization of his hours (17 "union" hours at $26/hr and 20 hours at $1) for that week.  He does not know why an alternate time sheet that differed from the one he turned in to Ms. Johnston would have been created.  Vol. I, 70-71; Exhibit 130.

115.   Andrus payroll records for the week ending June 15, 2008 show Hill was paid for 24 of his regular 40 hours and none of the overtime reflected on the sheet that he faxed to Ms. Johnston. Exhibit 128.

116.   Sterling paid Hill for 17 hours at $26/hour for the week ending June 15, 2008 and 20 hours at $1/hour, a week that Hill testified he worked 49 hours, all for Andrus and all union.  Exhibit 162, p. 000458.

117.   The daily work reports kept by EMJ on the Laurel Park job indicate that Sterling, not Andrus, was performing the carpentry work on the EMJ job.  Exhibit 136.

118.   Bolitho instructed David Milka, a Sterling employee, what jobs to work for Andrus. Milka worked for Andrus because Bolitho told him that Andrus needed help.  Vol. I, 47-48.

19

119.  David Milka, a Sterling employee, submitted a time sheet for the week ending June 22, 2008 showing that Milka worked 40 regular hours and 5 overtime hours on the following "Union" projects: "Max Azaira, Laurel Park and Mitchell's Troy."  Vol. I, 49-50; Exhibit 170, p. 000528.

120.  Milka did not recognize an alternate time sheet for that same week listing only 26 union hours at $26/hour.  Vol. I, 51; Exhibit 170, p. 000527.

121.  Milka was paid for 26 hours for the week ending June 22, 2008 by Sterling.  Exhibit 172, 000815.

122.  Andrus paid Milka $433.09 for the same week.  Exhibit 174, 001709.

123.  Milka did not recall whether he was working for both Andrus and Sterling at Laurel Park.  Vol. I, 54.

124.  Robert Campbell is a current Sterling employee who has worked for Sterling since 2002.  Vol. I, 78.

125.  Campbell's foreman, John Newcomb, asked him to work on the Plum Market job for Andrus Acoustical.  Campbell performed the same type of carpentry work as an Andrus employee that he performed as a Sterling employee.  Vol. I, 78-79, 84.

126.  Campbell had to go down to the Union hall and join the Union to do work for Andrus on the Plum Market job.  Vol. I, 90.

127.  Campbell's time sheet for March 8, 2009, shows that he worked at the Plum Market job for 30.5 hours.  Vol. I, 83; Exhibit 142.

128.  The bold writing on this time sheet is not his handwriting but he worked, as his own time sheets demonstrates, 30.5 hours on the Plum Market job for Andrus Acoustical during the week ending March 8, 2009. Vol. I, 83-84.

20

129. Campbell does not recognize an alternate time sheet for Campbell for the week ending March 8, 2009 that shows Campbell worked only 3 hours on the Plum Market job for that week but believes there may have been different rates because he might have been working for Sterling for part of the time.  Vol. I, 84-85; Exhibit 143.

130. Sterling's payroll for the week ending March 8, 2009, shows that Campbell was paid all 30.5 hours by Sterling.  Exhibit 144.

131. Campbell worked for Sterling for 13 years and only worked for Andrus for 3 weeks. Vol. I, 93.

132. Campbell was already working on the Plum Market job as a Sterling carpenter before going to work for Andrus for some work.  Vol. I, 87-88.

133. When Campbell went to the Union hall to join the Union to work for Andrus, Scott Lowes, the Union agent, took Campbell and others into a conference room for an hour-long monologue and told them he knew what they were up to.  Vol. I, 90.

134. When Campbell was working the Plum Market job for Sterling, the Union was picketing the site.  Vol. I, 92.

135. Phil Bax Currently works for Sterling Millwork and has worked there for 15 years.  He is a carpenter foreman and manages job sites. He uses all Sterling tools and charges all of his expenses on Sterling credit cards approved by his boss Mark Bolitho.  Vol. II, 6-7.

136. Bax retained his Sterling health care when working for Andrus.  Vol. II, 10.

137. Mark Bolitho asked Bax to work for Andrus Acoustical because he had a job "coming up" that required that Sterling provide union labor. Bax became an employee of Andrus Acoustical, joined the Union and did the same job and the same work for Andrus that he did at Sterling. Vol.

21

II, 8.

138.   Bax was the foreman at the Detroit Airport job. Vol. II, 11.

139.   The labor went through Andrus Acoustical but if there were any changes or anything to do with the contract, Bax would go to Bolitho.  Vol. II, 9.

140.   Bax used Sterling equipment, his Sterling credit card and turned his time sheets in to Ms. Johnston at the Sterling Millwork office.  Vol. II, 9.

141.   Bax would turn his time sheets in to Ms. Johnston, then she took his hours and sent them to Alan Andrus, who then sent Bax a check and sent Sterling a bill for the amount of Bax's wages.  Vol. II, 10.

142.   Bax's time sheet for the week ending June 15, 2008, which he filled out, shows he worked 33 and a half hours at union scale for Andrus Acoustical that week, and four hours for Sterling on the MDOT Walgreens Dearborn project.  Vol. II, 11; Exhibit 117, 000286.

143.   Bax does not recognize an alternate time sheet for his hours that same week ending June 15, 2008, that was not prepared by him, showing only 21 and a half hours "Union" hours and a rate of $26/hour.  Bax speculated that these hours may have gone under Sterling "Management" because they were still setting up the job but he conceded that he knew what hours he had worked that week and he believed they were all for Andrus.  Vol. II, 10-12; Exhibit 117, p. 000287.

144.   Sterling payroll records reveal that Bax was paid by Sterling for 21 and a half hours for the week ending June 15, 2008, not at all for the 4 "non-union" hours.  Exhibit 118. 000290.

145.   Andrus payroll records for week ending June 15, 2008 show that Bax was paid by Andrus for 16 of the 33 and a half union hours reported by Bax on his time sheet.  Exhibit 119.

146.  Bax conceded that he was running the Airport job and when he filled out his time sheet

22

and put down 33 and a half hours "at union scale under Andrus Acoustical" he knew what hours he had worked and for whom.  He testified that someone other than him, without consulting him, prepared this alternate time sheet recategorizing the hours he reported.  Vol. II, 11.

147.  Bax understood that all carpentry work on the Airport job was to be performed by Andrus and paid at the union scale.  Vol. II, 14.

148.  Bax worked for Sterling for 15 years and worked for Andrus for one year and signed up with the Union before starting work for Andrus.  Vol. II, 21.

149.  Bax did not recall telling Forester not to talk to union agents and did not believe he told Forester to keep quiet.  Vol. II, 20.

***Ms. Sarah Johnston Prepared the Payroll for Andrus Based on the Alternate Time Sheets, Which Were Created by An Unidentified Sterling Employee at Mark Bolitho's Direction***

150.  Ms. Johnston works for Sterling and has worked there since 2003.  She is the office manager and handles human resources and payroll.  Mark Bolitho is her direct boss.  Vol. II, 22-23.

151.  Ms. Johnston explained the format of the Sterling payroll records referencing an entry for Mark Forester on September 19, 2008 as an example.  Vol. II, 23; Exhibit 172, p. 000853-54.

152.  M. Forester is employee name, 1245 is the employee number, 54.00 is hours (regular) for that week, 6 overtime hours, $1404 is wages for the 54 regular hours, $312 is wages for the overtime, then $1716 is gross amount of wages, September 19, 2008 is the date he was paid.  Exhibit 172, p. 000851 shows that these entries are for the pay period ending 9-14-08 which indicates that all entries after that were for the pay week ending September 14, 2008.  "Other" represents vacation or sick pay.  All data regarding an employee is above their name - one line above their name.  Vol. II, 23-26; Exhibit 172, pp. 000853, 000851.

153.  The entire Sterling payroll, following this format, is found in Exhibit 172, pp. 000742-

001252.  Vol. II, 23.

154.  An employee has to be employed by Sterling for one year to qualify for health care coverage and if they leave and come back they have to requalify.  Vol. II, 26.

155.  The Andrus/Sterling employees did not lose their health care because they were not deemed to have quit Sterling when they went to work for Andrus.  Vol. III, 40.

156.  If a Sterling employee went to work for another contractor for more than two weeks, they would lose their health care coverage and would have to requalify if they returned to Sterling. Vol. II, 40.

157.  When she received time sheets from the Andrus/Sterling employees, she brought them to Bolitho and he, and sometimes the foreman, told her which hours needed to go to Andrus.  They would instruct her to change the hours on the time sheets and would approve them.  Vol. II, 31.

158.  She would receive the alternate time sheet and then either send Andrus the alternate time sheet or create an Excel spread sheet with all the employees adjusted hours per the alternate time sheets and send that to Andrus.  Vol. II, 29.

159.  Ms. Johnston testified that she worked with Mr. Bolitho and the foreman to determine which hours were Andrus and which were Sterling, but she had nothing to do with preparing the "alternate time sheets" and does not know who prepared them because this was "a very busy period."  Vol. II, 58.

160.  Jim Walker's time sheet for the week ending June 15, 2008 showing 42 hours worked on the Laurel Park job for Andrus Acoustical was typical of the time sheets that she would receive from a Andrus/Sterling employee.  This is a Sterling time sheet that he sent to her and then Andrus paid these hours. Vol. II, 27; Exhibit 125.

24

161. Ms. Johnston testified that she does not know any Andrus employees and believed that Mr. Walker was a Sterling employee who was paid by Andrus for these hours. Vol. II, 27-28.

162. The word "Union" on the time sheet indicates to her it is an Andrus job and being paid by Andrus. Vol. II, 29.

163. Ms. Johnston did not know why there was an alternate time sheet for Jim Walker for the week ending June 15, 2008. She did not create this time sheet and doesn't know "why she or whoever did this one" would have created it. Vol. II, 29-30.

164. Ms. Johnston testified that Laurel Park was a Sterling job and Jim Walker was a Sterling employee, so even if he was working for Andrus this week he could have been paid by Sterling. Vol. II, 31.

165. She would prepare an Excel spread sheet from the time sheets that she would send to Alan Andrus- the rate being paid to the Andrus/Sterling employees was $62.60/hour - she doesn't know if that is the full union rate or maybe also included a fee to Andrus. Vol. II, 32; Exhibit 133, p. 000402.

166. In looking at Dwayne Hill's actual time sheet for the week ending June 15, 2008, she does not know why she only sent in 24 hours to Andrus for payment by Andrus. She acknowledges that Dwayne Hill was the foreman and would know best how many hours he worked. Vol. II, 34.

167. Question to Ms. Johnston: "Regardless of what the time sheets said, how many hours, union, working for Andrus, you would refer to Mark Bolitho and the foreman for direction?" A: "Yes." Once she received the altered time sheet prepared, by an unidentified Sterling employee, at the direction of Mark or the foreman (which served as an invoice for Andrus), she would send Andrus the hours that were submitted to her and then she would ACH, or electronic transfer, the

funds to Andrus.  Vol. II, 33-34.

168.  "So you would send out the sheet which would show the hours which his employees worked and then you would wire transfer him payment for those hours?" A: "Yes."  Then Andrus would pay the Andrus/Sterling employees that amount.  Vol. II, 35.

169.  Alan Andrus did not review the time sheets, or say "hey this might be wrong" or have any input on the number of hours that Sterling directed him to pay his own employees.  Alan Andrus's only input was to write a check to pay the employees the hours that Sterling (through Ms. Johnston) told him to pay.  35-36.

170.  In a series of emails between Alan Andrus and Ms. Johnston on March 7, 2011, he is telling Ms. Johnston that he sent her a report for Phil Bax's hours showing 61 and a half hours worked for Andrus and wants to know if he should use those hours or the fewer hours that were shown on Ms. Johnston's report.  The following question and answer took place:

Q:    Why would Al be asking you how to pay his employees?
A:    These time sheets were submitted to me because they're Sterling employees.  So that's why Al is asking me.
Q:    So Sterling – Sterling would decide what hours Al's employees would get paid for?
A:    Sterling sent him the reports that had the employees' hours.
Q:    But he deferred to you to make that final decision, or to Sterling to make that final decision?
A:    Yes.
Q:    Regardless of how many hours his employees reported to him, he would defer to Sterling? Yes or no?
A:    Repeat the question please.
Q:    Regardless –

THE COURT: Wait. Stop a minute. I'm watching you ask the question. While she's thinking I'm watching Mr. Bolitho's head go up and down like a yes. This is very troublesome, and then her answers tend to follow that. So why don't you take a minute or two for Mr. Farmer to talk to Mr. Bolitho out in the hall and then we'll continue.  Vol. II, 36-38.

Q:    So I was asking you, regardless of the hours that Al Andrus' employees would report to him, he would defer to you, defer to you being Sterling, regarding hours that his

employees worked and that he paid?

A:     Yes.

Q:     And on this Exhibit 115, in fact, you told him to redo the hours based on your reports.

A:     Yes.

Q:     And again, Phil Bax was the foreman running that particular job, right?

A:     Which job.

Q:     The airport job.

A:     Yes.

Vol. II, 38.

171. Ms. Johnston would ACH (electronic transfer deposit) Andrus the cost of the labor for the hours dictated by Sterling plus 8 percent and an additional $5/hour. Vol. II, 39; Exhibit 116.

172. The effective date of 3-10-2011 on Exhibit 116, p. 000284, is the date that funds were received for the invoice that Andrus submitted on 3-7-2011. Vol. II, 39; Exhibit 116, p. 000284.

173. Alan Andrus cut the Andrus/Sterling employees' paychecks for these hours on March 11, 2011. So Andrus was paid by Sterling for these employees' hours before Andrus even paid them. Vol. II, 39-40; Exhibit 116, p. 000285.

174. Exhibit 116 shows Alan Andrus's handwriting saying "these hours are from Sarah 44 not Phil's 61.5." Vol. II, 40; Exhibit 116, p. 000285.

175. Ms. Johnston would provide Alan Andrus with all the payroll information regarding the Andrus/Sterling employees, including names, addresses, social security numbers, tax deduction preferences in addition to dictating the hours for which he should pay them. Sometimes Alan Andrus would be unaware of the name of the job to which the hours applied. Vol. II, 41, 40-41; Exhibit 169.

176. Ms. Johnston is not aware of any subcontractors utilized by Sterling other than Andrus who used Sterling employees to perform their subcontract work. Vol. II, 43.

27

177.  Each project on which Sterling utilized the Andrus/Sterling employees is detailed in a project accounting record that lists the cost for each individual project of equipment, material, labor, subcontracting and other.  Vol. II, 45; Exhibit 194.

178.  Sterling also tracked the projects through a History Detail Report that contains a breakout by job for carpentry labor for each particular job that lists each employee by name and social security number, the week ending for which he was being paid, the amount of hours for which he is being paid and the rate at which he was paid.  The designation "0503" is for carpentry.  Vol. II, 46; Exhibit 201.

179.  For example, for the week ending June 15, 2008, Dwayne Hill was paid for 17 hours at $26/hour and 20 hours at $1/hour.  Vol. II, 48; Exhibit 201, p. 002472.

180.  Ms. Johnston believed that the Plum Market and Laurel Park were Sterling jobs.  Vol. II, 49.

181.  Sterling paid its subcontractors in different ways.  Some submitted invoices, some would just call in hours from the foreman, others might have contracts under which they were paid on a percent basis.  Vol. II, 50.

182.  After Ms. Johnston would ACH Andrus so that Andrus could pay the Andrus/Sterling employees, based on the number of hours she had instructed Andrus to pay them for, Sterling had nothing to do with the accounting for fringe benefits.  Vol. II, 51.

183.  Alan Andrus would determine what the fringe benefits would be - he kept his own books with regard to what the fringe benefits would be and Ms. Johnston had no part in that calculation.  Vol. III, 62-63.

184.  Andrus was reimbursed by Sterling for all of the fringe benefits it paid - Andrus did

28

not pay anything to the Funds that he was not being reimbursed by Sterling.  Vol. III, 63.

185.  The more hours that the Andrus/Sterling employees worked for Andrus, the more money Andrus would make because there was a markup on each invoice for Andrus.  Vol. III, 45-46.

186.  The total hourly rate that Alan Andrus charged Sterling for the hours for those employees included a mark up for him and an hourly carpenter wage plus the CBA benefits that he would need to pay.  Vol. III, 63-64.

187.  Sterling paid Andrus a premium of $5/hour or 8% for the hours Andrus worked on "Sterling" projects.  Vol. III, 16.

188.  When Ms. Johnston received the time sheets from the Andrus/Sterling employees, she would get together with Mr. Bolitho and/or the foreman to determine how many hours in that week were Andrus hours versus Sterling hours.  Exhibit 133, p. 000402 is an example of a document she prepared to inform Alan Andrus of how many hours were Andrus hours after meeting with Mr. Bolitho and the foreman.  Vol. II, 52-54; Exhibit 133, p. 000402.

189.  Alan Andrus paid all of the workers for all of the hours that Ms. Johnston reported to him.  She has no idea whether he paid fringe benefits on those hours because that was not her job.  Vol. II, 55.

190.  On one occasion, Alan Andrus emailed Ms. Johnston telling her that the most a man can work overtime in one week is 18 hours at time and a half and if they work more than that he has to pay them double time. There is no limit on their overtime hours but there is a limit on the number of overtime hours that can be paid at only time and a half.  Beyond 18 overtime hours they must be paid double time.  In this particular week, one employee had 22 overtime hours and another had 23.

29

Alan Andrus asked Ms. Johnston if she wanted him to "bank" the or hours or pay them double time. Vol. II, 41-42, Vol. III, 26; Exhibit 114.

191.   Alan Andrus knows that banking hours is a violation of the CBA but he explains he was just asking her if she wants to "figure it out" and he used a "bad word."  He would not have used that word if he had known there was going to be a lawsuit.  Vol. III, 27; Exhibit 114.

192.   Alan Andrus had no explanation for why he was asking Ms. Johnston on another occasion if he should use the hours she reported to him (44) rather than the number of hours that the foreman, Phil Bax, had reported on his own time sheet (61 and a half).  Ms. Johnston instructed Alan Andrus to redo the hours based on her numbers, which he did without question, paying Phil for only 44 hours, even though Phil was the foreman who was in the field and knew best what work he had done.  Vol. III, 29-30; Exhibit 116.

193.   When Alan Andrus became aware of the allegations made by Matt Forester in his affidavit concerning the failure to pay full union wages for union hours worked, Alan Andrus discussed it with Bolitho who did not deny that it was happening.  Alan Andrus did not do any work with Sterling after that point.  Vol. III, 34.

194.   Andrus had no way of knowing whether his employees were working for Andrus or Sterling on the shared union projects.  Vol. III, 21.

195. So in the instance of James Walker's pay for the week ending June 15, 2008, for which the "alternate time sheet" shows 25 hours at $26/hour and 7 hours at $9/hour, Mr. Walker was paid by Sterling for those 25 hours and was paid for 24 hours that week by Andrus so actually was paid for 49 hours that week when his original time sheet listed only 42 hours - 40 regular and 2 overtime. Vol. II, 55-58; Exhibits 125, 126, 172 p. 000812.

196.  Although Ms. Johnston testified that she prepared the excel spread sheet that she sent to Alan Andrus for the week ending June 15, 2008, and that she did that following consultation with Bolitho and the foreman regarding how to break out the Andrus vs. Sterling hours, she has no idea who prepared the underlying alternate time sheet that actually shows the number of hours determined to be attributable to Andrus.  Vol. II, 58-59.

197.  She can only confirm that Mr. Walker submitted a time sheet indicating that he worked 42 hours at Laurel Park and that 25 of those hours were paid by Sterling and 24 were paid by Andrus.  Vol. II, 60.

***Mark Bolitho Was the Ultimate Decisionmaker for Sterling***

198.  Mark Bolitho decides on behalf of Sterling what bills are paid and when, who to hire and fire, rate of pay for office and field staff.  Vol. II, 64-65.

199.  He confirmed Ms. Johnston's testimony that she reviewed time sheets with him but thereby contradicted his deposition that he did not review time sheets before payroll was put together.  Vol. II, 65.

200.  When asked about Jim Walker's "time sheets" for the week ending June 15, 2008, he speculated that the reason Walker was not paid all union hours was that he probably did some work that was not union but he was "speculating" and it was probably "worked out" between project manager, the foreman and Bolitho.  He acknowledged that he testified earlier that he had no involvement in reviewing time sheets for payroll.  Vol. II, 74.

201.  For all of the carpentry labor that Sterling paid the Andrus/Sterling employees, Sterling did not pay any fringe benefits.  Vol. II, 81-82; Exhibit 194, pp. 002183-002187.

202.  Bolitho testified that he sought out only nonunion work but that some jobs bid as

nonunion required union work after Sterling had begun the project. For example, Bolitho explained that the Plum Market job was bid as a nonunion job but when the Union began picketing the job, the owners of Plum Market asked Sterling to bring in union workers, which Sterling did through Andrus. According to Bolitho, the job was fully framed in at that point and they had to get union workers to finish up acoustical work and drywall. Vol. II, 93.

203. Bolitho testified that he never would have bid on the Plum Market job if it had been a union job. Vol. II, 93-94.

204. Sterling has a high retention rate for its employees and none of those who testified at the trial has any desire to join the Union. Vol. I, 53, 63, 76, 92; Vol. II 19.

205. Bolitho has had an adversarial relationship with the Union for the past 6-8 years because he runs a large nonunion shop and is often picketed by the Union in attempts to disrupt his business. Vol. II, 87.

206. The Union has written letters to Sterling's customers to try to get Sterling's customers not to use Sterling. One such letter sent to Lord & Taylor accused Sterling of not paying a fair wage to its workers and asking Lord & Taylor to "make a managerial decision not to use Sterling." Vol. IV, 18-19; Exhibit 521.

207. Sterling has not received any work from Lord & Taylor since this letter was sent. Vol. IV, 19.

208. Andrus's payroll summary for 2008-2011, the invoices submitted to Sterling for nonacoustical ceiling work 2008-2011, Andrus's W-2s and Andrus's General Ledger for the years 2008-2011 include all invoices submitted to Sterling and all payments made to Andrus employees for their work for the years 2008-2011. Vol. III, 35-37; Exhibits 174, 176 pp. 001303-1448, 184,

191.

209.  Andrus never received any complaints from the Union regarding the Sterling workers that it sent down to the Union hall to join for the shared Andrus/Sterling projects.  Vol. III, 60.

210.  Of the roughly $33.6 million in sales done by Sterling in 2008-2011, $390,000 was done by Andrus.  Vol. IV, 30, Exhibit 154.

211.  The $390,000 figure reflected on Exhibit 154 does not include all of the carpentry labor that the Funds claim was performed on the shared Andrus/Sterling projects between 2008-2011. When the full scope of that work is included in the calculation, the gross receipts would have been much higher.  Vol. IV, 32-34, Exhibit 201.

## II.  Conclusions of Law

"While only parties to collective bargaining agreements are bound generally, in some instances a non-signatory to the agreement may be so closely related to a signatory that both are bound." *Distillery, Wine & Allied Workers Int'l Union, Local Union No. 32 v. Nat'l Distillers & Chem. Corp.*, 894 F.2d 850, 851 (6th Cir.1990) (applying the "single employer" test created by the NLRB which considers "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership"); *Trustees of Detroit Carpenters Fringe Benefit Funds v. Industrial Contracting, LLC*, 581 F.3d 313, 317–18 (6th Cir. 2009) (applying the "alter ego" test which asks "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership").

In *Industrial Contracting*, the Sixth Circuit further explained the alter ego doctrine and the applicable standard:

> The alter ego doctrine is an equitable doctrine "developed to prevent employers from evading obligations under the [National Labor Relations] Act merely by changing

33

or altering their corporate form." *NLRB v. Allcoast Transfer, [Inc.]*, 780 F.2d [576,] 579 [6th Cir.1986) ]. The doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer. *See id.* at 582–83. We have addressed alter-ego operations that occur in two factual contexts. The first is when the new entity begins operations but is "'merely a disguised continuance of the old employer.'" *NLRB v. Fullerton Transfer & Storage Ltd., Inc.*, 910 F.2d 331, 336 (6th Cir.1990) (quoting *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106, 62 S.Ct. 452, 86 L.Ed. 718 (1942)). The second is what is referred to as a "double-breasted operation," where "two or more coexisting employers performing the same work are in fact one business, separated only in form." *Fullerton Transfer*, 910 F.2d at 336.

                    *                    *                    *

In double-breasting cases, we have confronted two common fact patterns: (1) the "classic" double-breasting operation in which a union contractor creates a second, nonunion company, and (2) the "reverse" double-breasting situation in which a non-union company opens a sister company that becomes a union signatory.

581 F.3d at 317-18.

The Sixth Circuit has developed a multi-factor test for determining whether two entities are

alter egos and has stressed that no one factor is controlling and that each factor need not be present

for alter ego status to be found:

The Sixth Circuit test for determining whether two companies are alter egos has been adopted from the case law of the National Labor Relations Board. We look to see "'whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership.'" *Id.* (quoting *Nelson Elec. v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)). In applying these factors, no individual factor is outcome determinative; instead, "all the relevant factors must be considered together." *Allcoast Transfer*, 780 F.2d at 582. Under Sixth Circuit precedents, moreover, an employer's intent to evade the obligations of a collective bargaining contract is merely one of the factors to be considered and is not a prerequisite to the imposition of alter-ego status. *Fullerton Transfer*, 910 F.2d at 337.

581 F.3d at 318.   In either case, the essence of the double breasted inquiry is whether the business

practice being challenged causes union workers to "face the threat of losing traditional work to a

nonunion double-breast." *Becker Elec. Co. v. International Brotherhood of Electrical Workers,*

34

*Local Union No. 212 AFL–CIO*, 927 F.2d 895, 899 (6th Cir. 1991).

In the instant case, the Court concludes that "[t]he two defendants, [Andrus and Sterling], are separate corporations, which, of course, is the beginning (not the end) of the analysis, since an *alter ego* claim is based on the equitable doctrine that courts may sometimes disregard the formalities of business structures when those structures are misused for the purpose of avoiding a company's legal obligations." *Laborer's Pension Trust Fund-Detroit Vicinity v. Interior Exterior Specialists Co.*, No. 04-74514, 2008 WL 4443066, at *2 (E.D. Mich. Sept. 30, 2008), *aff'd in part rev'd in part*, *Laborer's Pension Trust Fund-Detroit Vicinity v. Interior Exterior Specialists Construction Grp, Inc.*, 394 F. App'x 285 (6th Cir. 2010). In fact, the Sixth Circuit has expressly held that common ownership is not a necessary prerequisite for a finding of alter ego status. *Industrial Contracting*, 581 F.3d at 318 (quoting *Wilson v. Int'l Bhd. Of Teamsters*, 83 F.3d 747, 759 (6th Cir. 1996).

As an initial matter, the Court rejects the argument, made by Defendants in their motion for directed verdict (Vol. III, 103-05) and urged again in their post-trial briefing, that Plaintiffs failed to establish that the any of the projects on which the Andrus/Sterling employees worked required all union labor. The Court rejected this argument during trial and rejects it again now that all of the evidence is in. The EMJ subcontract contained a clause specifically requiring the work under the subcontract to be "fully union compliant" and Plaintiffs submitted documentary evidence indicating that the Detroit Airport job required Sterling to "furnish all union labor." Bolitho seemed unclear as to the exact meaning of the clause in the EMJ contract (maybe it related to "safety" issues), and testified that work at the Airport was done for different subcontractors, some of whom required union work and some of whom did not. Bolitho testified that he "believed" that Laurel Park was bid

35

as a nonunion job and only after beginning work was he required to provide union labor.  This belief was never substantiated by any additional or different documentation governing the Laurel Park job.  Bolitho's testimony on this topic is strangely reminiscent of his testimony in the 1993 *Sterling Construction* case, in which another judge in this district found that Bolitho had operated an alter ego entity.  In that case, Bolitho also claimed that he "thought" certain jobs were nonunion, or that they "began" as nonunion and only required limited union compliance after the job had begun.  Exhibit 155 pp. 00044-445, Findings of Fact and Conclusions of Law, *Trustees of the Carpenters Pension Fund v. Bolitho, et al.*, No. 93-cv-74427, at 10-11  (E.D. Mich. Oct. 30, 1998) (Hood, J.).  Judge (now Chief Judge) Hood discounted Bolitho's testimony in that context and this Court does here as well.  There, as here, Bolitho found a way to get his foot in the door on union jobs and then misused the corporate structure for the purpose of avoiding the legal obligation requiring that the work performed be fully union compliant.

Apart from Bolitho's testimony that the jobs did not require all union labor and therefore he was free to use Sterling labor on those jobs, testimony which the Court finds simply not credible and unsupported by the evidence presented at trial, Defendants offered no other documentary evidence or testimony to rebut Plaintiffs' evidence, which included specific contract language and witness testimony, that these jobs did require all union labor.   Of great significance to this Court was the testimony of the foremen who actually performed the work on the airport and Laurel Park jobs, both of whom ran those jobs under the directive and belief that the jobs required all union labor.  According to Andrus/Sterling employee Dwayne Hill, the foreman on the Laurel Park job, the entire Laurel Park job was union work being performed for Andrus and nobody performing any carpentry work on the Laurel Park job was working for Sterling.   Dwayne Hill supervised all of the

36

Andrus/Sterling employees on the jobs he ran for Andrus. Vol. I, 67-69. Similarly, Phil Bax, the Andrus/Sterling employee who was instructed by Bolitho to serve as the foreman on the Detroit Airport job, testified that all of the carpentry work on the jobs within the airport, of which there were seven, was union work performed by Andrus and paid for by Andrus. At trial, Bax confirmed that there were *never* times on the airport jobs where the carpentry work was being done partially by Andrus (union) and partially by Sterling (nonunion) employees. Vol. II, 6, 7-8, 14-15. Neither Hill nor Bax could explain why the hours they reported as Andrus union hours repeatedly were cut back and reported, on alternate time sheets that they did not recognize, as partially nonunion work. Phil Bax thought "maybe" a small amount of his time was considered "management" work for Sterling but he was unable to explain how those hours came to be divvied up on the alternate time sheets. Although Ms. Johnston testified that the division of hours between Sterling and Andrus was provided by Bolitho "or the foremen," the evidence at trial established that neither of these foremen was involved in providing Ms. Johnston or anyone at Sterling with a "division" of their hours to support the creation of the alternate time sheets. Both were of the belief that all of the hours worked by them and the other Andrus/Sterling employees on these jobs were for Andrus and they reported them as union hours. The Court finds that both the Detroit Airport and Laurel Park jobs required all, and only, union labor. The Court concludes, based upon a clear preponderance of the evidence, that the shared union jobs listed on Exhibit 154 required all carpentry work to be performed by union employees, at union wages and fringes paid into the Plaintiff Funds on those wages.

Turning to an analysis of the *Fullerton Transfer* factors, Defendants urge that there is no evidence of common ownership in this case. Andrus and Sterling share no office space, have no financial dependencies, have no common officers or directors, have separate bank accounts and file

separate tax returns.  Common ownership, however, is not a prerequisite to a finding of alter ego status.  *Industrial Contracting*, 581 F.3d at 318.  Of great significance here is the fact that, although there was no common ownership, Andrus demonstrated a total passivity to Sterling's directives and control that created a relationship little different from one marked by common ownership.  "While there is technically different ownership of [Andrus and Sterling], the separate ownership is not as firm as would usually be the case between two distinct companies."  *Trustees of the Painters Union Deposit Fund v. Interior/Exterior Specialist, Co.*, No. 05-70110, 2008 WL 724355, at *15 (E.D. Mich. March 18, 2008) (Roberts, J.).  Indeed, it was established at trial that when Andrus and Sterling did operate as "separate" corporate entities, as they did prior to 2008 when Sterling appears to have legitimately subcontracted acoustical ceiling work to Andrus, Andrus used its own employees and its own equipment, tracked its own employees' hours and Andrus supervised and paid it own workers.  *See infra*, discussion of interrelation of management and operations.  The Court concludes that the absence of common ownership in this case, which can be a factor weighing against a finding of alter ego status, does not weigh in Defendants' favor on the facts of this case.

Defendants also assert that the two entities had their own equipment and tools.  Like the common ownership factor, this factor, which typically favors a finding of no alter ego status, just does not bear the weight normally placed on it on the facts of this case.  While it may be true that Andrus and Sterling did have their own tools and equipment, all of the equipment used by the Andrus/Sterling employees on the shared projects was Sterling equipment.  Andrus provided no equipment or tools or supervisory support of any kind.

As to business purpose, Sterling is a large general contractor performing carpentry, drywall, metal studs, insulation, acoustic ceiling, millwork, doors, trim, hardware and supply and installation

of all of these items. Sterling has gross revenues of approximately $10 million per year. Andrus is much smaller, 95% of its business is acoustic ceiling installation and it has gross revenues of approximately $500,000 per year. Viewed from this perspective, the two entities do not appear to have a "substantially identical" business purpose. Defendants argue that this Court must find "substantial" and not merely "overlapping" management, business purpose, operations equipment, customers, supervision and ownership. The Court disagrees with this interpretation of the governing law. As this Court discussed at length in its Summary Judgment opinion in this case, the Sixth Circuit expressly rejected this same argument when it affirmed Judge Lawson's alter ego finding in *IES*, *supra*. Defendants in *IES* (represented by the same counsel representing Andrus in this action) argued that Judge Lawson erroneously found alter ego liability in that case because the trial evidence did not support a finding of *substantial* identity of interest on the *Fullerton* factors. Judge Lawson disagreed, denying post-judgment motions challenging his alter ego finding, as did the Sixth Circuit on appeal. The Sixth Circuit, while reversing and remanding on other issues in *IES*, expressly found that substantial evidence at trial supported Judge Lawson's finding of alter ego status, and rejected defendants' argument that each of the *Fullerton* factors must be analyzed separately, and reiterating that "the test under the alter ego doctrine is flexible and that no one factor is determinative." *IES*, 394 F. App'x at 293-94. *See also Painters Union*, 2008 WL 724355, at *15 (finding that the "overlap" in business purpose shared by a general contractor and a painting subcontractor was a factor that precluded a strong finding of separate business purposes).

Additionally in this case, on the shared projects at issue here, Sterling's and Andrus's business purpose was completely co-extensive, creating a complete identity of purpose. Although carpentry work was a small percentage of Andrus's business (and importantly Andrus performed

39

carpentry work *only* for Sterling on the shared union projects that are subject of this action), both Sterling and Andrus performed the same work (with the Sterling-borrowed Andrus/Sterling employees) for the same customers on the shared projects on which they ran their alter ego operation. *See Dobson Indus., Inc. v. Iron Workers Local Union No. 25*, 237 F. App'x 39, 46–47 (6th Cir. 2007) (finding a double breasted operation where the two entities had only six common customers, only two discreet areas of overlapping business which amounted to less than 10% of the nonunion entities business and had only worked together on 11 projects in a two year time span); *Bd. of Trustees of the Plumbers, Pipefitters & Equip. Service, Local Union No. 392 Pension Fund v. Humbert d/b/a Genesis Mechanical, et al.*, No. 13-cv-4, 2016 WL 705243, at *12 (S.D. Ohio Feb. 23, 2016) (finding evidence of common business purpose where both companies performed work covered by the CBA and the companies shared only three customers). While Andrus and Sterling insist that on these projects they were simply engaged in a subcontractor/contractor relationship, there is no evidence of any subcontractor agreements between them and the management and operations on these shared union projects varied drastically from other projects on which Andrus and Sterling were dealing in a strictly subcontractor/contractor relationship. *See infra,* discussion regarding management and operations. The Court concludes that Andrus and Sterling did share a common business purpose between the years 2008-2011, a factor that weighs in favor of a finding of alter ego liability.

Of greatest significance to the Court, however, is the substantial interrelation of management and operations that was present in this case. Supervision of the shared projects on which Andrus "supplied the labor" by hiring Sterling employees, was completely controlled by Sterling, specifically Mark Bolitho. There was complete interrelation of management, operations and

supervision on these shared projects. In fact, Andrus all but ceased to exist for purposes of Andrus/Sterling projects. The Andrus/Sterling employees (those that Andrus hired from Sterling to perform the union work) were told where and when to work by Sterling (Bolitho or his foreman), they used Sterling equipment and tools, they were covered by Sterling health plans, they were supervised by Sterling employees, they submitted time sheets to Sterling, they were paid according to Sterling's (Bolitho's) random and unsubstantiated allocation of their hours. Andrus had no input on these issues and Alan Andrus never inquired whether these Andrus/Sterling employees were getting paid union wages and fringes for *all* of the covered work they performed on the shared union projects. Alan Andrus was not concerned because Bolitho reimbursed him (plus a profit) for every dollar he paid to the Andrus/Sterling employees and reimbursed him for every fringe benefit that was paid on Andrus/Sterling jobs. If Bolitho was performing nonunion work on the Andrus union jobs, Alan Andrus was not aware of this, although he acknowledged that allowing nonunion work to be performed on Andrus union jobs would have been a violation of his CBA.

In addition to exercising complete control over where and when the Andrus/Sterling employees worked, Sterling was solely responsible for preparing the payroll on the jobs on which Andrus and Sterling operated together, which put Sterling (and specifically Mark Bolitho) wholly (albeit indirectly) in control of what fringe benefits were paid into the Plaintiff Funds. The workers would report their hours to Ms. Johnston, who would then consult with Mark Bolitho who would then randomly, and without consulting the foremen or the men who actually performed the work, convert some of the worker's union hours to Sterling hours. While Ms. Johnston says that she sometimes would consult with the foremen, none of the foremen remembers ever having had discussions regarding the conversion of their union reported hours to nonunion hours and none of

them recognized or was aware that the alternate time sheets had been prepared. And, importantly, the Andrus/Sterling employees could not understand why the hours that they reported to Ms. Johnston for the union work that they performed for Andrus would have been adjusted to Sterling hours by someone at Sterling because they believed that the Andrus/Sterling jobs required all and only union labor. The Court finds incredible Ms. Johnston's testimony on this critical issue.

Defendants never did offer a credible explanation for the creation of the alternate time sheets. Mark Bolitho testified that he believed that the Andrus/Sterling employees were legitimately performing both union and nonunion work on the shared union projects but this belief was never substantiated at trial and is utterly discredited by the contract documents that specified all union labor, and the testimony of every Andrus/Sterling employee, none of whom recognized or could explain the "alternate" time sheets and who believed that when working on these jobs, they were working for Andrus, performing union work and accordingly reported "union" hours on their time sheets. The evidence at trial never did reveal the identity of the Sterling employee whose handwriting appears on the alternate time sheets, although it was clear that it was done by someone at Sterling. Ms. Johnston testified that "it was a busy time" and she is not sure who prepared the alternate time sheets although she had no problem fully relying on the alternate time sheets for purposes of creating the payroll hours to send to Andrus! Ms. Johnston testified that the hours were divided between Andrus (union) and Sterling (nonunion) by Bolitho and/or the foremen on the jobs and then the breakdown was given to her. Yet none of the foremen testified to having ever participated in such a post-hoc breakdown of their hours, none acknowledged having assisted Bolitho, who was not on the job sites on a daily basis observing for himself the work being done, in recharacterizing the union hours that they reported as shown on the alternate time sheets. And

in fact Bolitho's testimony on this issue is inherently contradictory as he denies on the one hand having had any input into the preparation of the payroll and on the other is allegedly the individual who instructed Ms. Johnston on how to create that payroll.  Whatever the truth behind the creation of the alternate time sheets that served as the basis for the payment of union wages and fringes in this case, the evidence at trial failed to establish the legitimacy of Defendants' claim that  certain of the hours reported by the workers as having been union work performed for Andrus in fact were legitimately nonunion hours performed for Sterling.

Defendants urge the Court to conclude that, because Andrus required the Sterling-borrowed employees to join the union for purposes of working on these shared union projects, and because Andrus paid fringe benefits on all hours that were reported to Andrus by Sterling as union hours, the whole operation was legal and union compliant.   This of course ignores the fact that, as the Court has found, Sterling had total control of the Andrus payroll due to the alter ego operation and under-reported to Andrus the actual hours of covered carpentry work performed on the shared union jobs. If Sterling had subcontracted the work to a union shop that Sterling did not control, Sterling would have been unable to manipulate the hours that were reported as covered carpentry work as Bolitho was free to do here.  A union shop that maintained its own corporate identity would have been obligated to track and report all of the carpentry labor on all of the shared union projects and the Funds would have had little to complain about.  But that is not what happened here.

In substance, Bolitho and Sterling are attempting to do what they tried to do in 1989 with Sterling Construction, only this time rather than creating a new corporate entity, Bolitho and Sterling dominated a completely passive existing union entity to accomplish the same thing – avoidance of union obligations on union work.  The Court is well aware that this case presents a unique pattern

of alter ego conduct slightly outside the more common alter ego context: that is to say that Sterling and Andrus do lack a complete identity of interest in a macro sense. However, as the Sixth Circuit has continually observed, the alter ego doctrine remains flexible so that it can reach all forms of business practices that cause union workers to lose covered work to a nonunion shop. And that is exactly what occurred here.

The Court finds that operating as they did on the shared union projects between the years 2008-2011, Sterling and Andrus functioned as alter egos, artificially categorizing the hours of covered carpentry work in a way that enabled the Andrus/Sterling operation to avoid making all of the fringe benefit contributions that would otherwise have been due and owing to the Plaintiff Funds under the Andrus CBA. The two entities operated in such a way that Andrus's obligations under its CBA were not fully met. The Court therefore GRANTS Plaintiffs' claim for unpaid fringe benefits under an alter ego theory.

The Court further determines that both Alan Andrus and Mark Bolitho, as officers of Andrus and Sterling respectively, are individually liable for the unpaid contributions under the Michigan Builders Trust Fund Act ("MBTFA"), Mich. Comp. Laws § 570.151 et seq. The Andrus/Sterling alter ego operation received payments for the work performed on the shared union jobs in excess of the cost of those jobs and utilized the monies received for purposes other than full payment of laborers who were engaged by them to perform the work. *See Trustees of the Michigan Regional Council of Carpenters Employee Benefit Funds v. Accura Concrete Walls, Inc.*, 408 F. Supp. 2d 370, 373 (E.D. Mich. 2005) (holding that corporate officers were personally liable under the MBTFA where it was clear that they "collected monies for covered work and failed to make fringe benefits payments for the covered work").

44

### III.  Conclusion

Given the unique circumstance in which the Court applies the alter ego doctrine in this case, the issue of damages will require analysis through a slightly different lens.  The alter ego finding is limited to those jobs on which Andrus and Sterling worked together on union jobs to deprive the Plaintiffs of the full measure of union contributions.  The Court will not, as Plaintiffs request, hold Sterling responsible for unpaid contributions on the hundreds of nonunion jobs that Sterling has worked outside the Andrus/Sterling joint arrangement, work that represents millions of dollars in Sterling revenue.

The Court GRANTS the Plaintiffs' claim for unpaid fringe benefits under an alter ego theory. Andrus, Sterling, Alan Andrus and Mark Bolitho are jointly responsible for the unpaid contributions. The exact amount of Plaintiffs' loss will be decided in the damages phase of the trial.  Further, Plaintiffs are entitled to conduct an audit of the books and records of the Andrus/Sterling alter ego to determine each and every project on which Andrus and Sterling worked together from 2008 to the date on which they produce such books and records.

IT IS SO ORDERED.


s/Paul D. Borman_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  March 22, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 22, 2016.

s/Deborah Tofil_____
Case Manager