UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRUSTEES OF THE DETROIT
CARPENTERS FRINGE BENEFIT
FUNDS,                                          Case No. 11-cv-14656


                    Plaintiffs,                  Paul D. Borman
                                                 United States District Judge

v.

ANDRUS ACOUSTICAL, INC.,
a Michigan Corporation, STERLING
MILLWORK, INC., a Michigan
Corporation, ALAN ANDRUS, an
individual, and MARK BOLITHO,
an individual, jointly and severally,

                    Defendants.
_____/

FINDINGS OF FACT AND CONCLUSIONS OF LAW
FOLLOWING BENCH TRIAL ON DAMAGES

On March 22, 2017, following a four-day bench trial on the issue of liability,

this Court entered its Findings of Fact and Conclusions of Law, awarding judgment

in favor of Plaintiffs on their claim for unpaid fringe benefits against Defendants

Andrus Acoustical, Inc. ("Andrus"), Sterling Millwork Inc. ("Sterling"), Alan Andrus

and Mark Bolitho, under an alter ego theory of liability. *Trustees of the Detroit

Carpenters Fringe Benefit Funds v. Andrus Acoustical, et al.,* No. 11-cv-14656, 2016

1

WL 1125594 (E.D. Mich. March 22, 2016). The Court found the Defendants jointly and severally responsible for the unpaid fringe benefit contributions based upon the fraudulent conduct of the Sterling/Andrus alter ego entity. (ECF No. 87, Amended Findings of Fact and Conclusions of Law) ("Liability FFCs".)

Following the parties' unsuccessful efforts to settle on damages following the liability ruling, the Court conducted a two-day bench trial, on July 17-18, 2017, on damages. The parties filed Proposed Findings of Fact and Conclusions of Law on damages, and Plaintiffs filed a Reply. (ECF Nos. 105, 109, 110.) Following are the Court's Findings of Fact and Conclusions of Law on the issue of damages.

### A. Stipulations and Matters Still in Dispute

1.     Plaintiffs seek damages in the amount of $1,147,534.36, representing unpaid fringe benefit contributions in the amount of $297,567.10 and prejudgment interest in the amount of $424,983.63, plus $424,983.63 – the greater of liquidated damages of 20% of outstanding benefits or interest on the unpaid contributions – plus a reasonable attorney fee yet to be determined. Plaintiffs' damages are based on unpaid fringe benefits on the following eight (8) jobs, performed by the Sterling/Andrus alter ego, that were the subject of extensive testimony and evidence during liability phase of the trial: Laurel Park, Mitchell's Ocean Club/Ocean Prime, Flagstar Bank Ann Arbor, Plum Market Ann Arbor, Plum Market West Bloomfield,

Teriyaki Experience, Minute Suites Philadelphia, Detroit Metropolitan Airport Phases I-IV ("Detroit Airport").  (ECF No. 103, Damages Trial Tr. Vol. I, p. 10:1-11; Plaintiffs' Damages Trial Proposed Findings of Fact and Conclusions of Law ("Pls.' DPFCs.") ¶ 26.)  Each of these jobs, apart from Mitchell's/Ocean Prime, is identified on Plaintiff's Damages Trial Exhibit ("Pls.' DTE") 154.

2.      The parties have stipulated, for purposes of calculating damages, that the "field" carpentry and "millwork" carpentry audits, set forth in Plaintiffs' Damages Trial Exhibits ("Pls.' DTE") 205 and 206 respectively, are properly calculated and that the prejudgment interest as calculated by Plaintiffs (Pls.' DTE 211) is properly calculated.  (ECF No. 102, Stipulations of Parties ¶¶ 1-3, Exs. A-C.)  Although the parties dispute whether these amounts are properly awarded under the Court's alter ego liability ruling, the audits establish that the following amounts, if found by the Court to be due and owing, are properly calculated:

- Laurel Park Food Court

    $35,868.37 (carpentry)
    $22,185.47 (carpentry millwork)
    $87,842.42 (prejudgment Interest)

- Mitchell's Ocean Club/Ocean Prime

    $43,014.13 (carpentry millwork)
    $65,080.29 (prejudgment interest)

- Flagstar Bank Ann Arbor

$7,062.76 (carpentry)
$244.49 (carpentry millwork)
$11,056.74 (prejudgment interest)

- Plum Market Ann Arbor

  $451.41 (carpentry)
  $8111.72 (carpentry millwork)
  $12,957.04 (prejudgment interest)

- Plum Market West Bloomfield

  $91,842.95 (carpentry)
  $35,393.92 (carpentry millwork)
  $171,714.47 (prejudgment interest)

- Teriyaki Experience

  $1994.76 (carpentry millwork)
  $1929.45 (prejudgment interest)

- Minute Suites Philadelphia

  $5974.34 (carpentry millwork)
  $5781.74 (prejudgment interest)

- Detroit Airport Phase 1

  $6,794.97 (carpentry)
  $14,322.97 (carpentry millwork)
  $31,753.63 (prejudgment interest)

- Detroit Airport Phase 2

  $8996.93 (carpentry)
  $1839.71 (carpentry millwork)
  $16,511.14 (prejudgment interest)

- Detroit Airport Phase 3

    $2859.02 (carpentry)
    $4895.75 (carpentry millwork)
    $11,733.89 (prejudgment interest)

- Detroit Airport Phase 4

    $5030.96 (carpentry)
    $682.47 (carpentry millwork)
    $8622.82 (prejudgment interest)

3.      The Defendants concede that, based on their interpretation of the Court's alter ego liability holding, the Defendants would owe the union fringe benefits in the amount of $66,613.01 on "field" carpentry work, i.e. carpentry work done at the actual physical location of the construction project, performed on the Laurel Park, Flagstar Bank, and Detroit Airport projects. (ECF No. 107, Defendants' Damages Phase Proposed Findings of Fact and Conclusions of Law ("Defs.' DPFCs") ¶ 3; Defendants' Damages Trial Exhibit ("Defs.' DTE" 603.)

4.      Defendants disagree, based on their interpretation of the Court's alter ego liability holding, that fringe benefits are due on any "millwork" carpentry, i.e. carpentry work done at the Sterling mill, performed on the Laurel Park, Flagstar Bank, or Detroit Airport jobs under the Court's alter ego holding. (Defs.' DPFCs ¶ 4.)

5.      Defendants further disagree, based on their interpretation of the Court's alter ego liability holding, that *any* fringe benefits, either for field carpentry or

carpentry millwork, are due on any of the remaining five (5) jobs: Mitchell's Ocean Club/Ocean Prime, Plum Market Ann Arbor, Plum Market West Bloomfield, Teriyaki Experience, or Minute Suites Philadelphia. (Defs.' DPFCs ¶ 4.)

6. The Court finds, as summarized below and as clearly set forth in its Amended Findings of Fact and Conclusions of Law from the liability phase of the trial, that the Court's Sterling/Andrus alter ego liability holding applies to each of these 8 jobs and applies to *all* covered carpentry work as defined in the Andrus Collective Bargaining Agreement ("CBA"), whether performed by the Sterling/Andrus alter ego entity in the field or in the mill, on each of these eight jobs. There is no dispute that the nature of both the field and millwork carpentry at issue in this action would be "covered carpentry work" under the Andrus CBA.

### B. Findings of Fact

7. "Millwork carpentry" as well as "field carpentry" work on these eight jobs was performed by the Sterling/Andrus alter ego, as acknowledged by Sterling's Sarah Johnston in her processing of the payroll. Although Sterling's Mark Bolitho testified, and Defendants take the position, that no "millwork" was ever required to be union work, Sarah Johnston expressly directed that at least some millwork performed by the Sterling/Andrus employees was to be paid at the union rate: "Also pay the mill stuff at union rate as well. Sarah." (Pls.' DTE 170, p. 662.) Moreover,

as detailed further below, numerous Sterling/Andrus employees reported on their time sheets specifically performing "millwork" for Andrus/Union. Thus, the Court finds inherently incredible the testimony that millwork was never required to be union work.

8.    **Laurel Park**: The following evidence, which establishes an underlying contractual obligation to employ union labor on the Laurel Park job and establishes that the Sterling/Andrus alter ego employees submitted time sheets through Sarah Johnston for work that they performed on the Laurel Park job, supports the Court's conclusion, based upon a preponderance of the evidence, that the Laurel Park job falls within the Court's alter ego holding and that fringe benefits are owed on this job:

a)    The Sterling subcontract with EMJ, the contractor for the Laurel Park job, required "full compliance for all work performed under" the subcontract with Sterling. (Liability FFC 26.)

b)    Dwayne Hill, the foreman on the Laurel Park job, testified at the liability phase of the trial that the entire Laurel Park job was union work being performed for Andrus and that nobody performing carpentry work on the Laurel Park job was working for Sterling. (Liability FFC 27.)

c)    EMJ project manager Adam Graves testified that the subcontract with Sterling required all work to be fully union compliant. (Liability FFC 28.)

d)	Sterling was never approved to perform non-union work on the Laurel Park job.  (Liability FFCs 28-40.)

e)	Multiple Sterling/Andrus employees submitted time sheets through Sarah Johnston reporting hours worked on the Laurel Park job as "Union" and "Andrus" and those employees did not recognize at trial "alternate time sheets" that had been prepared directing that those same hours be "Sterling," not Union, pay.  (Liability FFCs 104-123.)

f)	Despite the fact that the Laurel Park subcontract required all union work, employee time sheets designating their hours as "millwork" were calculated at Sterling rates of pay.  (*See, e.g.* Pls.' DTE 170 p. 653-654.)

9.	**Mitchell's Ocean Club/Ocean Prime**:  The following evidence, which establishes an underlying contractual obligation to employ union labor on the Mitchell's Ocean Prime job and establishes that the Sterling/Andrus alter ego employees submitted time sheets through Sarah Johnston for work that they performed on the Ocean Prime job, supports the Court's conclusion, based upon a preponderance of the evidence, that the Mitchell's Ocean Prime job falls within the Court's alter ego holding and that fringe benefits are owed on this job:

a)	Sterling's subcontract with Restaurant Specialties Inc. ("RSI") for the work to be performed at Mitchell's Ocean Prime in Troy, Michigan, called for Sterling

to "provide union labor and materials for fabrication and installation of all millwork, wood doors, casework, interior glass and glazing, associated hardware and finished carpentry as per plans, specifications, and manuals." (Defs.' DTE 605, ¶ 5; Damages Trial Tr. Vol. 1, p. 33:12-14.)

b)      The Court finds not credible the testimony of Mr. Bolitho that he was unaware that this contract, or any Sterling contract, ever required union work to be performed at the Sterling mill. (ECF No. 103, Damages Trial Tr. Vol. 1, p. 28:10-14.) Mr. Bolitho admits that if a contract called for union labor, whether it be for millwork or field work, Sterling would have to subcontract that work out to a union labor contractor (ECF No. 81, Liability Trial Tr. Vol. 1, p. 67:4-5), yet he testified that no union work has ever been done at the Sterling mill, despite the clear language of the RSI contract calling for union millwork and installation, and despite Sarah Johnston's notations directing payment of "mill stuff" at union rates. (Damages Trial Tr. Vol. 1, p. 33:3-36:5; Pls.' DTE 170 p. 662.)

c)      The Court finds, based on the testimony of Sterling/Andrus employees that the designation on their time sheets that their work on the Ocean Prime/Mitchell's job was for "Union" indicated "Union hours for Andrus," and also based on the testimony of Sarah Johnston that "Union" on a time sheet meant the hours were being paid by Andrus, that the designation "Union" on a time sheet always meant work

being performed for the Sterling/Andrus alter ego. (Liability Trial Tr. Vol. 1. p. 50:3-51:15; Vol. 2, p. 28:25-29:2.)

d)      Sterling/Andrus workers' time sheets were replete with notations that their hours worked at Mitchell's Troy/Ocean Prime were "union" hours but the evidence established that these hours were paid at least in part through Sterling payroll. (Pls.' DTE 170 p. 484-511, 522-25, 541-44; Pls.' DTE 172 p. 788-94, 811-18; Pls.' DTE 230 p. 1-2; Liability FFCs 119-121.)

e)      Although the Ocean Prime job is not among those listed on Pls.' DTE 154 (the "shared jobs" list), there was sufficient evidence introduced at both phases of the trial to support the finding that the Mitchell's Ocean Prime job was required to be union work and that the Plaintiff Funds were deprived of the full measure of fringe benefit contributions on all of the work performed on the Ocean Prime job.

f)      Alan Andrus testified at the damages trial that it was possible that Sterling/Andrus employees could have been performing covered carpentry work on the Mitchell's Ocean Prime job and he would not have known about it. (Damages Trial Tr. Vol. 1, 26:2-6.)

10.      **Flagstar Bank Ann Arbor**: The following evidence, which establishes an underlying contractual obligation to employ union labor on the Flagstar Bank job and establishes that the Sterling/Andrus alter ego employees submitted time sheets

through Sarah Johnston for work that they performed on the Flagstar Bank job, supports the Court's conclusion, based upon a preponderance of the evidence, that the Flagstar Bank job falls within the Court's alter ego holding and that fringe benefits are owed on this job:

a)      The October 24, 2007 Sterling subcontract proposal for the Flagstar Bank to the contractor Butcher & Baecker, submits a "union base bid" of $85,080.00, for the entire scope of work. (Pls.' DTE 233, p. 1.) The bid is followed on November 9, 2007, by a purchase order from Butcher & Baecker in the amount of $85,080.00. (*Id*. p. 2.)

b)      Sterling/Andrus workers' time sheets that they prepared were replete with notations that their hours worked at Flagstar Bank Ann Arbor were "union" hours but the evidence established that many of these hours were not paid by Andrus but were paid through Sterling payroll. (Pls.' DTE 170 p. 740; Pls.' DTE 191 pp. 1706-07; Pls.' DTE 219 pp. 2-3; Pls.' DTE 232 pp. 5-7; Pls.' DTE 233 pp. 5-6, 11-13.)

c)      Sarah Johnston submitted multiple excel spreadsheets to Alan Andrus and emailed Andrus the hours worked by the Sterling/Andrus employees, and Andrus submitted invoices for some of the union hours worked, on the Flagstar Bank job. (Pls.' DTE 176, pp. 1342-1378.)

11.  **Plum Market Ann Arbor**:  The following evidence, which establishes that the Sterling/Andrus alter ego employees submitted time sheets through Sarah Johnston for work that they performed on the Plum Market Ann Arbor job, supports the Court's conclusion, based upon a preponderance of the evidence, that the Plum Market Ann Arbor job falls within the Court's alter ego holding and that fringe benefits are owed on this job:

a)  When a worker's time sheet indicated work done for Andrus, the job was necessarily a union job because all of the carpentry work that Andrus does must be union work.  (Liability FFC 60.)

b)  The Court finds credible the testimony of the Sterling/Andrus employees and the testimony of Sarah Johnston that the designation "Union" on a time sheet always meant "Andrus."

c)  On January 2, 2008, Al Andrus emailed Sarah Johnston and asked her for the hours on the Flagstar Bank (Ann Arbor) job and the "new job". (LTE 169.) Sarah Johnston responded to the email that same day providing hours for several Sterling/Andrus workers for Flagstar Bank and Plum Market (Ann Arbor) (the new job).  (*Id.*)  *See also* Liability Trial Tr. Vol 2, pp. 40:24 - 41:11.)

d)  Sarah Johnston prepared excel spreadsheets and provided them to Al Andrus and Andrus invoiced Sterling for payroll on the Plum Market Ann Arbor job

and multiple Sterling/Andrus employees reported hours on the Plum Market Ann Arbor job as "union" hours worked for Andrus. These hours were paid in many instances by Sterling, not through Andrus. (Pls.' DTE 170 pp. 736-740; Pls.' DTE 176 pp. 1408-1422; Pls.' DTE 191 p. 1706; Pls.' DTE 225 pp. 4, 6, 7, 10; Pls.' DTE 232 pp. 5, 6, 8; Pls.' DTE 235 p. 4-6.)

12. **Plum Market West Bloomfield**: The following evidence, which establishes an underlying contractual obligation to employ union labor on part of the Plum Market West Bloomfield job and establishes that the Sterling/Andrus alter ego employees submitted time sheets through Sarah Johnston for work that they performed on the Plum Market West Bloomfield job, supports the Court's conclusion, based upon a preponderance of the evidence, that portions of the Plum Market West Bloomfield job fall within the Court's alter ego holding and that fringe benefits are owed on these portions of the job:

a) An August 25, 2008 Sterling Proposal Re: Plum Market West Bloomfield proposes "to furnish all **union** labor, material, tools, equipment, supervision, insurance, and taxes necessary to perform" the work for a price of $420,000. (Pls.' DTE 236, p. 1) (Emphasis in original).

b) A January 26, 2009 proposal from Sterling for the Plum Market West Bloomfield job proposes an "additional cost" of $110,880 to complete certain work

with union labor. (Pls.' DTE 239.)  Nicholas Katrivesis, the project manager for the Plum Market West Bloomfield job, testified at the damages trial that Pls.' DTE 236, the August bid for all union work at a cost of $420,000, was never accepted by the owners and that prior to January, 2009, none of the work on the Plum Market West Bloomfield project was required by contract to be union work. (Damages Trial Tr. Vol. II 34:2-35:15.)

c)      Mr. Katrivesis testified that when the Union began to picket a different Plum Market store located at Maple and Lahser in Bloomfield Township, the Plum Market West Bloomfield project owner struck an agreement with the Union that "all carpentry work after the meeting and agreement had to be union," and agreed to finish the West Bloomfield project with union labor.  (Damages Trial Tr. Vol. II 18:4-20:3, 22:7-17.)

d)      Although Mr. Katrivesis did contradict himself on the timing of his meeting with the Union representative, Scott Lowes, that resulted in the owner's agreement to employ only union labor, Mr. Katrivesis clearly recalled that the picketing that forced the agreement was in December 2008 or early January 2009 because it was very cold outside, and that after the meeting with Lowes, all remaining work on the Plum Market West Bloomfield job, which was completed just a few months later, had to be performed by Union workers. (Damages Trial Tr. Vol. II 29:5-

7; 39:10-40:5.)

e)    The Court finds, based on Mr. Katrivesis's testimony, that beginning sometime in January, 2009, *all* remaining carpentry work on the Plum Market West Bloomfield job was required to be Union work.  This finding is corroborated by the time sheets and invoices submitted by the Sterling/Andrus workers, which post-date December, 2008.  Plaintiff has submitted no evidence of such time sheet submissions in 2008 and has produced no evidence to rebut Mr. Katrivesis's testimony, which the Court finds credible based on other record evidence, that the August, 2008 proposal for "all union labor" was never accepted by the owners of Plum Market West Bloomfield.

f)    The Court finds that only those amounts identified in the audit for the Plum Market West Bloomfield job from January 2009 forward are subject to the Court's alter ego finding.

g)    A March 3, 2009 email from Alan Andrus to Sarah Johnston asks: "Sarah, is there payroll for Plum Market? Al." (Pls.' DTE 236, p. 2.)

h)    Sarah Johnston prepared excel spreadsheets and provided them to Al Andrus and Andrus invoiced Sterling for payroll on the Plum Market West Bloomfield job and multiple Sterling/Andrus employees reported hours on the Plum Market West Bloomfield job as "union" hours worked for Andrus.  These hours were

15

paid in many instances by Sterling, not through Andrus. (Liability FFCs 124-130; Pls.' DTE 146-149; Pls.' DTE 151; Pls.' DTE 191 p. 1845; Pls.' DTE 227 pp. 7-8, 16, 18; Pls.' DTE 236 p. 9, 11.)

i)      Mark Bolitho testified that time sheets were not utilized for any millwork (*see* ECF No. 107, Defs.' Proposed Findings of Fact 21) and that millwork carpenters used a time card but the evidence at trial suggested otherwise, and established many instances of "mill work" being reported on a time sheet. (*See, e.g.*, Pls.' DTE 236 pp. 9, 11-13, 20-23, 29.)

13.    **Teriyaki Experience**:  The following evidence, which establishes an underlying contractual obligation to employ union labor on the Teriyaki Experience job and establishes that the Sterling/Andrus alter ego employees submitted time sheets through Sarah Johnston for work that they performed on the Teriyaki Experience job, supports the Court's conclusion, based upon a preponderance of the evidence, that the Teriyaki Experience job falls within the Court's alter ego holding and that fringe benefits are owed on this job:

a)      Sterling's proposal for the Teriyaki Experience project at Somerset Mall in Troy, Michigan quotes "Union Installation."  (Pls.' DTE 237.)

b)      In a July 5, 2011 email to Sarah Johnston reporting his hours for the previous week, Sterling/Andrus employee Phil Bax noted the absence of union

workers at the Teriyaki Experience job site and told Sarah Johnston to "use her own discretion." Bax's time record for that day lists 3.5 hours "teriyaki experience millwork union through andrus," but Bax received no pay from Andrus for that week and was paid for all 38.5 hours reported for that week by Sterling. (Pls.' DTE 172 pp. 1184-85; Pls.' DTE 191 p. 1731; Pls.' DTE 229 p. 3; Pls.' DTE 237 p. 4.)

      c)     Sterling/Andrus employee Phil Bax sent multiple emails to Sarah Johnston, expressly reporting his hours on "teriyaki experience millwork union through andrus," Sarah Johnston sent emails to Alan Andrus reporting the number of hours Sterling/Andrus employee Phil Bax worked on the Teriyaki Experience job, and Andrus sent invoices to Sterling for payroll for the Teriyaki Experience job, but many of these union hours were paid through Sterling's payroll and not through Andrus. (LTE 172 pp. 1182-85, 1191-92; Pls.' DTE 176 pp. 1444-48; Pls.' DTE 191 p. 1731; Pls.' DTE 229 p. 2; Pls.' DTE 237 pp. 3-5.)

      d)     All of the project hours paid by Sterling on the Teriyaki Experience job were millwork carpentry hours and all are covered by the Court's alter ego holding.

      14.   **Minute Suites**: The following evidence, which establishes that the Sterling/Andrus alter ego employees submitted time sheets through Sarah Johnston for the work that they performed work on the Minute Suites job, supports the Court's conclusion, based upon a preponderance of the evidence, that the Minute Suites job

falls within the Court's alter ego holding and that fringe benefits are owed on this job:

a)      Sterling employees reported hours worked on the Minute Suites job as "Union," or "through Al," or "minute suites Philly (union)," or specifically as "millwork union through Andrus," and submitted them to Sarah Johnston, but were paid for many of those hours by Sterling. (Pls.' DTE 234 pp. 1-11; Pls.' DTE 172 p. 1155; Pls.' DTE 176 pp. 1434-35; Pls.' DTE 223 pp. 2-3; Pls.' DTE 191 p. 1729.)

b)      All of the project hours paid by Sterling on the Minute Suites job were millwork carpentry hours and all are covered by the Court's alter ego holding.

15.      **Detroit Airport Jobs**:    The following evidence, which establishes an underlying contractual obligation to employ union labor on the Detroit Airport jobs and establishes that the Sterling/Andrus alter ego employees submitted time sheets through Sarah Johnston for work that they performed  on the Detroit Airport jobs, supports the Court's conclusion, based upon a preponderance of the evidence, that the Detroit Airport jobs fall within the Court's alter ego holding and that fringe benefits are owed on these jobs:

a)      This Court's Amended Findings of Fact and Conclusions of Law related to the liability phase of the trial clearly set forth the evidence establishing that all of the work on the Detroit Airport jobs was required to be all and only union labor. (Liability FFCs 46-47, 147.)

b)     This Court's Amended Findings of Fact and Conclusion of Law related to the liability phase of the trial clearly set forth the evidence establishing that the Detroit Airport jobs were reported and paid through the fraudulent process of submitting time sheets to Sarah Johnston.  (FFCs 75-99.)

c)     Substantial evidence was presented during both phases of the trial establishing that the Sterling/Andrus alter ego improperly characterized hours for work performed on the Detroit Airport jobs and deprived the funds of fringe benefits on these jobs.  (Pls.' DTE 117 p. 286-87; Pls.' DTE 118 p. 290; Pls.' DTE 119; Pls.' DTE 170 pp. 576, 634-39, 662-63, 695; Pls.' DTE 213 pp. 2-3; Pls.' DTE 215 pp. 2, 13; Pls.' DTE 215B p. 2, 4; Pls.' DTE 217 p. 3; Pls.' DTE 232 pp. 9-23.)

d)     The Sterling/Andrus employees reported their "mill" hours on the Detroit Airport jobs as "union" hours and Sarah Johnston directed that "mill stuff" be paid at union rate.  These hours were paid in part through Sterling payroll.  (*See, e.g.* Pls.' DTE 170 pp. 662, 724; Pls.' DTE 215 p. 5.)

**C.     Conclusions of Law**

16.     The Court finds that the Sterling/Andrus alter ego entity was operating on each of these eight jobs, binding Sterling to the Andrus CBA when performing covered carpentry work, and under the Court's alter ego liability holding, fringe benefits are due and owing the Plaintiffs on all covered carpentry work performed,

whether "in the field" or "in the mill" on these jobs. This Court rejects Defendants' Proposed Conclusion of Law 2 suggesting that this Court "meant" that its alter ego holding only applied to "field" work. The Court never distinguished between "field" work and "mill" work in any way in its Amended Findings of Fact and Conclusions of Law.

17. Given the Court's previous holding that Sterling and Andrus operated as alter egos on each of these jobs, meaning either that the underlying contract required Union labor and/or that the Sterling/Andrus workers reported their time as "Union" hours worked, it is immaterial whether the work on those jobs was done "in the field" or "in the mill." If millwork carpentry was done on these jobs during the time frame establishing the alter ego relationship, Sterling was bound by the Andrus CBA to pay fringe benefits because it was performing covered work on these alter ego jobs. *Trustees of the Detroit Carpenters Fringe Benefits Funds v. Industrial Contracting, LLC*, 581 F.3d 313, 318 (6th Cir. 2009) ("The [alter ego] doctrine operates to bind an employer to a collective bargaining agreement if it is found to be an alter ego of a signatory employer.") Thus, the Sterling/Andrus alter ego was required to contribute fringe benefits into the Plaintiff Funds, for every hour of covered carpentry work performed by every Sterling/Andrus employee on those jobs, regardless of whether Alan Andrus was aware that such work was being done at the Sterling mill and

regardless of where such work was being performed.

18.     Nothing in the Court's liability ruling requires the conclusion that Andrus and Sterling were alter egos with respect to covered carpentry work performed "in the field" but not to covered carpentry work performed "in the mill" on these shared projects.  When working on any one of these jobs, Sterling employees were necessarily Sterling/Andrus employees, working at all times for the Sterling/Andrus alter ego, and  fringe benefits were required to be paid.

19.     Because Andrus failed to keep adequate records demonstrating the hours of covered work performed by the Sterling/Andrus employees, and in fact completely abdicated his obligation to track covered work on these jobs to Sterling, and either deferred to Sarah Johnston's calculations or simply failed to keep track of hours of covered work at all, the Sterling/Andrus alter ego "is liable for contributions on all hours worked during [the] period[s] in which it has been demonstrated that some covered work was performed." *Michigan Laborer's Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.2d 692, 697 (6th Cir. 1994).  Because Plaintiffs have shown "that some covered work was performed during the audit period for which no contributions were made and that the Defendants failed to maintain adequate records," the alter ego entity is liable for all work performed.  *Trustees of Northwester Plumbers and Pipefitters Pension Plan v. Helm & Assoc.*, No. 10-cv-739, 2011 WL 4688784, at *9

(N. D. Ohio Oct. 4, 2011).

20.     Apart from the testimony of Mr. Katrivesis regarding the Plum Market West Bloomfield job, which establishes that the Plum Market West Bloomfield job did not require union labor prior to January, 2009, the Defendants have presented no credible evidence to rebut the Plaintiffs' evidence establishing that all of the covered carpentry work performed on each of these eight jobs falls fully within the Court's alter ego holding.

21.     Under ERISA, in any action by or on behalf of a plan to collect unpaid fringe benefit contributions, where judgment is entered in favor of the Plan, the Court *shall* award:

(A)     the unpaid contributions,
(B)     interest on the unpaid contributions,
(C)     an amount equal to the greater of –
    (i)      interest on the unpaid contributions, or
    (ii)     liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
(D)     reasonable attorneys' fees and costs of the action, to be paid by the defendant, and
(E)     such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g).

22.     The parties have stipulated that the Funds' auditor properly calculated the unpaid contribution amounts in each of these categories, i.e. carpentry and carpentry

millwork, for each of the eight jobs. The Court therefore awards the following amounts on its liability judgment in favor of Plaintiffs and against Defendants for unpaid fringe benefit contributions, on both "carpentry" and "carpentry millwork," on these eight jobs as follows:

**Laurel Park**

$35,868.37 (carpentry)
$22,185.47 (carpentry millwork)

**Mitchell's Ocean Club/Ocean Prime**

$43,014.13 (carpentry millwork)

**Flagstar Bank Ann Arbor**

$7,062.76 (carpentry)
$244.49 (carpentry millwork)

**Plum Market Ann Arbor**

$451.41 (carpentry)
$8,111.72 (carpentry millwork)

**Plum Market West Bloomfield**

$76,392.56 (carpentry) (**2009 only**)
$34,205.71 (carpentry millwork) (**2009 only**)

**Teriyaki Experience**

$1,994.76 (carpentry millwork)

**Minute Suites Philadelphia**

   $5,974.34 (carpentry millwork)

**Detroit Airport Phase 1**

   $6,794.97 (carpentry)
   $14,322.97 (carpentry millwork)

**Detroit Airport Phase 2**

   $8,996.93 (carpentry)
   $1,839.71 (carpentry millwork)

**Detroit Airport Phase 3**

   $2,859.02 (carpentry)
   $4,895.75 (carpentry millwork)

**Detroit Airport Phase 4**

   $5,030.96 (carpentry)
   $682.47 (carpentry millwork)

**Total Unpaid Contributions:**          **$280,928.50**

23.     The Sixth Circuit has held that § 1132(g)(2) is mandatory following a judgment in favor of the plan. *See, e.g., Michigan Carpenters Council Health and Welfare Fund v. C.J. Rogers, Inc.*, 933 F.2d 376, 388 (6th Cir. 1991) ("The language of Section 1132(g) is mandatory, and once the provision applies," and prejudgment interest is owed on all unpaid contributions due and owing "on the date of the award.").

24.    The parties have stipulated that the Funds' auditors have correctly calculated the amounts of prejudgment interest owing on each of these unpaid contribution amounts.  Accordingly, the Court awards Plaintiffs prejudgment interest in the following amounts:

(1)    **Laurel Park**:                    $87,842.42

(2)    **Mitchell's Ocean Prime**:         $65,080.29

(3)    **Flagstar Bank Ann Arbor**:        $11,056.74

(4)    **Plum Market Ann Arbor**:          $12, 957.04

(5)    **Plum Market West Bloomfield**:    $146,538.28 (2009 only)

(6)    **Teriyaki Experience**:            $1,929.45

(7)    **Minute Suites**:                  $5,781.74

(8)    **Detroit Airport Jobs**

         **Phase I**                       $31,753.63

         **Phase II**                      $16,511.14

         **Phase III**                     $11,733.89

         **Phase IV**                      $8,622.82

**Total Prejudgment Interest**            **$399,807.44**

**Total Damages owed to Funds**

**$280,928.50** (unpaid contributions)

**$399,807.44** (prejudgment interest)

**$399,807.44** (2nd prejudgment interest) (1132(g)(2)(C)(i))

**Total:** **$1,080,543.38**

25.     Plaintiffs are also entitled to an award of reasonable attorneys fees calculated based upon the lodestar method. Plaintiffs' counsel shall submit its lodestar calculation to the Court within ten (10) days of the date of the this Order.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated:  November 27, 2017

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 27, 2017.

s/Deborah Tofil
Case Manager